(Slip Opinion)          OCTOBER TERM, 2013          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LANE *v.* FRANKS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 13–483.   Argued April 28, 2014—Decided June 19, 2014

As Director of Community Intensive Training for Youth (CITY), a program for underprivileged youth operated by Central Alabama Community College (CACC), petitioner Edward Lane conducted an audit of the program's expenses and discovered that Suzanne Schmitz, an Alabama State Representative on CITY's payroll, had not been reporting for work.  Lane eventually terminated Schmitz' employment.  Shortly thereafter, federal authorities indicted Schmitz on charges of mail fraud and theft concerning a program receiving federal funds.  Lane testified, under subpoena, regarding the events that led to his terminating Schmitz.  Schmitz was convicted and sentenced to 30 months in prison.  Meanwhile, CITY was experiencing significant budget shortfalls.  Respondent Franks, then CACC's president, terminated Lane along with 28 other employees in a claimed effort to address the financial difficulties.  A few days later, however, Franks rescinded all but 2 of the 29 terminations—those of Lane and one other employee.  Lane sued Franks in his individual and official capacities under 42 U. S. C. §1983, alleging that Franks had violated the First Amendment by firing him in retaliation for testifying against Schmitz.

   The District Court granted Franks' motion for summary judgment, holding that the individual-capacity claims were barred by qualified immunity and the official-capacity claims were barred by the Eleventh Amendment.  The Eleventh Circuit affirmed, holding that Lane's testimony was not entitled to First Amendment protection.  It reasoned that Lane spoke as an employee and not as a citizen because he acted pursuant to his official duties when he investigated and terminated Schmitz' employment.

*Held*:

   1. Lane's sworn testimony outside the scope of his ordinary job duties is entitled to First Amendment protection.  Pp. 6–13.

   (a) *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568, requires balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Under the first step of the *Pickering* analysis, if the speech is made pursuant to the employee's ordinary job duties, then the employee is not speaking as a citizen for First Amendment purposes, and the inquiry ends.  *Garcetti* v. *Ceballos*, 547 U. S. 410, 421.  But if the "employee spoke as a citizen on a matter of public concern," the inquiry turns to "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  *Id.*, at 418.  Pp. 6–8.

   (b) Lane's testimony is speech as a citizen on a matter of public concern.  Pp. 8–12.

     (1) Sworn testimony in judicial proceedings is a quintessential example of citizen speech for the simple reason that anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth.  That obligation is distinct and independent from any separate obligations a testifying public employee might have to his employer.  The Eleventh Circuit read *Garcetti* far too broadly in holding that Lane did not speak as a citizen when he testified simply because he learned of the subject matter of that testimony in the course of his employment.  *Garcetti* said nothing about speech that relates to public employment or concerns information learned in the course of that employment.  The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.  Indeed, speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment.  Pp. 9–11.

     (2) Whether speech is a matter of public concern turns on the "content, form, and context" of the speech.  *Connick* v. *Myers*, 461 U. S. 138, 147–148.  Here, corruption in a public program and misuse of state funds obviously involve matters of significant public concern. See *Garcetti*, 547 U. S., at 425.  And the form and context of the speech—sworn testimony in a judicial proceeding—fortify that conclusion.  See *United States* v. *Alvarez*, 567 U. S. ___, ___.  Pp. 11–12.

   (c) Turning to *Pickering*'s second step, the employer's side of the scale is entirely empty.  Respondents do not assert, and cannot demonstrate, any government interest that tips the balance in their favor—for instance, evidence that Lane's testimony was false or erro-

neous or that Lane unnecessarily disclosed sensitive, confidential, or privileged information while testifying.  Pp. 12–13.

 2. Franks is entitled to qualified immunity for the claims against him in his individual capacity.  The question here is whether Franks reasonably could have believed that, when he fired Lane, a government employer could fire an employee because of testimony the employee gave, under oath and outside the scope of his ordinary job responsibilities.  See *Ashcroft* v. *al-Kidd*, 563 U. S. \_\_\_, \_\_\_.  At the relevant time, Eleventh Circuit precedent did not preclude Franks from holding that belief, and no decision of this Court was sufficiently clear to cast doubt on controlling Circuit precedent.  Any discrepancies in Eleventh Circuit precedent only serve to highlight the dispositive point that the question was not beyond debate at the time Franks acted.  Pp. 13–17.

 3. The Eleventh Circuit declined to consider the District Court's dismissal of the claims against respondent Burrow in her official capacity as CACC's acting president, and the parties have not asked this Court to consider them here.  The judgment of the Eleventh Circuit as to those claims is reversed, and the case is remanded for further proceedings.  P. 17.

523 Fed. Appx. 709, affirmed in part, reversed in part, and remanded.

 SOTOMAYOR, J., delivered the opinion for a unanimous Court.  THOMAS, J., filed a concurring opinion, in which SCALIA and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–483

EDWARD R. LANE, PETITIONER *v.* STEVE FRANKS, IN HIS INDIVIDUAL CAPACITY, AND SUSAN BURROW, IN HER OFFICIAL CAPACITY AS ACTING PRESIDENT OF CENTRAL ALABAMA COMMUNITY COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 19, 2014]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Almost 50 years ago, this Court declared that citizens do not surrender their First Amendment rights by accepting public employment. Rather, the First Amendment protection of a public employee's speech depends on a careful balance "between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968). In *Pickering*, the Court struck the balance in favor of the public employee, extending First Amendment protection to a teacher who was fired after writing a letter to the editor of a local newspaper criticizing the school board that employed him. Today, we consider whether the First Amendment similarly protects a public employee who

provided truthful sworn testimony, compelled by sub-poena, outside the course of his ordinary job responsibilities. We hold that it does.

## I

In 2006, Central Alabama Community College (CACC) hired petitioner Edward Lane to be the Director of Community Intensive Training for Youth (CITY), a statewide program for underprivileged youth. CACC hired Lane on a probationary basis. In his capacity as Director, Lane was responsible for overseeing CITY's day-to-day operations, hiring and firing employees, and making decisions with respect to the program's finances.

At the time of Lane's appointment, CITY faced significant financial difficulties. That prompted Lane to conduct a comprehensive audit of the program's expenses. The audit revealed that Suzanne Schmitz, an Alabama State Representative on CITY's payroll, had not been reporting to her CITY office. After unfruitful discussions with Schmitz, Lane shared his finding with CACC's president and its attorney. They warned him that firing Schmitz could have negative repercussions for him and CACC.

Lane nonetheless contacted Schmitz again and instructed her to show up to the Huntsville office to serve as a counselor. Schmitz refused; she responded that she wished to "'continue to serve the CITY program in the same manner as [she had] in the past.'" *Lane* v. *Central Ala. Community College*, 523 Fed. Appx. 709, 710 (CA11 2013) (*per curiam*). Lane fired her shortly thereafter. Schmitz told another CITY employee, Charles Foley, that she intended to "'get [Lane] back'" for firing her. 2012 WL 5289412, *1 (ND Ala., Oct. 18, 2012). She also said that if Lane ever requested money from the state legislature for the program, she would tell him, "'[y]ou're fired.'" *Ibid.*

Schmitz' termination drew the attention of many, including agents of the Federal Bureau of Investigation,

which initiated an investigation into Schmitz' employment with CITY. In November 2006, Lane testified before a federal grand jury about his reasons for firing Schmitz. In January 2008, the grand jury indicted Schmitz on four counts of mail fraud and four counts of theft concerning a program receiving federal funds. See *United States* v. *Schmitz*, 634 F. 3d 1247, 1256–1257 (CA11 2011). The indictment alleged that Schmitz had collected $177,251.82 in federal funds even though she performed "'virtually no services,'" "'generated virtually no work product,'" and "'rarely even appeared for work at the CITY Program offices.'" *Id.*, at 1260. It further alleged that Schmitz had submitted false statements concerning the hours she worked and the nature of the services she performed. *Id.*, at 1257.

Schmitz' trial, which garnered extensive press coverage,[1] commenced in August 2008. Lane testified, under subpoena, regarding the events that led to his terminating Schmitz. The jury failed to reach a verdict. Roughly six months later, federal prosecutors retried Schmitz, and Lane testified once again. This time, the jury convicted Schmitz on three counts of mail fraud and four counts of theft concerning a program receiving federal funds. The District Court sentenced her to 30 months in prison and ordered her to pay $177,251.82 in restitution and forfeiture.

Meanwhile, CITY continued to experience considerable budget shortfalls. In November 2008, Lane began reporting to respondent Steve Franks, who had become president of CACC in January 2008. Lane recommended that

––––––––

[1] See, *e.g.,* Lawmaker Faces Fraud Charge in June, Montgomery Advertiser, May 6, 2008, p. 1B; Johnson, State Lawmaker's Fraud Trial Starts Today, Montgomery Advertiser, Aug. 18, 2008, p. 1B; Faulk, Schmitz Testifies in Her Defense: Says State Job was Legitimate, Birmingham News, Feb. 20, 2009, p. 1A; Faulk, Schmitz Convicted, Loses her State Seat, Birmingham News, Feb. 25, 2009, p. 1A.

Franks consider layoffs to address the financial difficulties. In January 2009, Franks decided to terminate 29 probationary CITY employees, including Lane. Shortly thereafter, however, Franks rescinded all but 2 of the 29 terminations—those of Lane and one other employee—because of an "ambiguity in [those other employees'] probationary service." Brief for Respondent Franks 11. Franks claims that he "did not rescind Lane's termination . . . because he believed that Lane was in a fundamentally different category than the other employees: he was the director of the entire CITY program, and not simply an employee." *Ibid.* In September 2009, CACC eliminated the CITY program and terminated the program's remaining employees. Franks later retired, and respondent Susan Burrow, the current Acting President of CACC, replaced him while this case was pending before the Eleventh Circuit.

In January 2011, Lane sued Franks in his individual and official capacities under Rev. Stat. §1979, 42 U. S. C. §1983, alleging that Franks had violated the First Amendment by firing him in retaliation for his testimony against Schmitz.[2] Lane sought damages from Franks in his individual capacity and sought equitable relief, including reinstatement, from Franks in his official capacity.[3]

The District Court granted Franks' motion for summary judgment. Although the court concluded that the record raised "genuine issues of material fact . . . concerning [Franks'] true motivation for terminating [Lane's] employment," 2012 WL 5289412, *6, it held that Franks was entitled to qualified immunity as to the damages claims

---

[2] Lane also brought claims against CACC, as well as claims under a state whistleblower statute, Ala. Code §36–26A–3 (2013), and 42 U. S. C. §1985. Those claims are not at issue here.

[3] Because Burrow replaced Franks as President of CACC during the pendency of this lawsuit, the claims originally filed against Franks in his official capacity are now against Burrow.

because "a reasonable government official in [Franks'] position would not have had reason to believe that the Constitution protected [Lane's] testimony," *id.,* *12. The District Court relied on *Garcetti* v. *Ceballos*, 547 U. S. 410 (2006), which held that "'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes.'" 2012 WL 5289412, *10 (quoting *Garcetti*, 547 U. S., at 421). The court found no violation of clearly established law because Lane had "learned of the information that he testified about while working as Director at [CITY]," such that his "speech [could] still be considered as part of his official job duties and not made as a citizen on a matter of public concern." 2012 WL 5289412, *10.

The Eleventh Circuit affirmed. 523 Fed. Appx., at 710. Like the District Court, it relied extensively on *Garcetti*. It reasoned that, "[e]ven if an employee was not required to make the speech as part of his official duties, he enjoys no First Amendment protection if his speech 'owes its existence to [the] employee's professional responsibilities' and is 'a product that the "employer himself has commissioned or created."'" *Id.,* at 711 (quoting *Abdur-Rahman* v. *Walker*, 567 F. 3d 1278, 1283 (CA11 2009)). The court concluded that Lane spoke as an employee and not as a citizen because he was acting pursuant to his official duties when he investigated Schmitz' employment, spoke with Schmitz and CACC officials regarding the issue, and terminated Schmitz. 523 Fed. Appx., at 712. "That Lane testified about his official activities pursuant to a subpoena and in the litigation context," the court continued, "does not bring Lane's speech within the protection of the First Amendment." *Ibid.* The Eleventh Circuit also concluded that, "even if . . . a constitutional violation of Lane's First Amendment rights occurred in these circumstances, Franks would be entitled to qualified immunity in his personal capacity" because the right at issue had not been

clearly established. *Id.,* at 711, n. 2.

We granted certiorari, 571 U. S. __ (2014), to resolve discord among the Courts of Appeals as to whether public employees may be fired—or suffer other adverse employment consequences—for providing truthful subpoenaed testimony outside the course of their ordinary job responsibilities. Compare 523 Fed. Appx., at 712 (case below), with, *e.g., Reilly* v. *Atlantic City*, 532 F. 3d 216, 231 (CA3 2008).

## II

Speech by citizens on matters of public concern lies at the heart of the First Amendment, which "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth* v. *United States*, 354 U. S. 476, 484 (1957). This remains true when speech concerns information related to or learned through public employment. After all, public employees do not renounce their citizenship when they accept employment, and this Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights. See, *e.g., Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589, 605 (1967); *Pickering*, 391 U. S., at 568; *Connick* v. *Myers*, 461 U. S. 138, 142 (1983). There is considerable value, moreover, in encouraging, rather than inhibiting, speech by public employees. For "[g]overnment employees are often in the best position to know what ails the agencies for which they work." *Waters* v. *Churchill*, 511 U. S. 661, 674 (1994) (plurality opinion). "The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *San Diego* v. *Roe*, 543 U. S. 77, 82 (2004) (*per curiam*).

Our precedents have also acknowledged the government's countervailing interest in controlling the operation

of its workplaces. See, *e.g., Pickering*, 391 U. S., at 568. "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U. S., at 418.

*Pickering* provides the framework for analyzing whether the employee's interest or the government's interest should prevail in cases where the government seeks to curtail the speech of its employees. It requires "balanc[ing] . . . the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U. S., at 568. In *Pickering*, the Court held that a teacher's letter to the editor of a local newspaper concerning a school budget constituted speech on a matter of public concern. *Id.,* at 571. And in balancing the employee's interest in such speech against the government's efficiency interest, the Court held that the publication of the letter did not "imped[e] the teacher's proper performance of his daily duties in the classroom" or "interfer[e] with the regular operation of the schools generally." *Id.*, at 572–573. The Court therefore held that the teacher's speech could not serve as the basis for his dismissal. *Id.,* at 574.

In *Garcetti*, we described a two-step inquiry into whether a public employee's speech is entitled to protection:

"The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had

an adequate justification for treating the employee differently from any other member of the general public." 547 U. S., at 418 (citations omitted).

In describing the first step in this inquiry, *Garcetti* distinguished between employee speech and citizen speech. Whereas speech as a citizen may trigger protection, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.,* at 421. Applying that rule to the facts before it, the Court found that an internal memorandum prepared by a prosecutor in the course of his ordinary job responsibilities constituted unprotected employee speech. *Id.,* at 424.

## III

Against this backdrop, we turn to the question presented: whether the First Amendment protects a public employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities.[4] We hold that it does.

## A

The first inquiry is whether the speech in question—Lane's testimony at Schmitz' trials—is speech as a citizen on a matter of public concern. It clearly is.

---

[4] It is undisputed that Lane's ordinary job responsibilities did not include testifying in court proceedings. See *Lane* v. *Central Ala. Community College*, 523 Fed. Appx. 709, 712 (CA11 2013). For that reason, Lane asked the Court to decide only whether truthful sworn testimony that is not a part of an employee's ordinary job responsibilities is citizen speech on a matter of public concern. Pet. for Cert. i. We accordingly need not address in this case whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties, and express no opinion on the matter today.

1

Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment.

In rejecting Lane's argument that his testimony was speech as a citizen, the Eleventh Circuit gave short shrift to the nature of sworn judicial statements and ignored the obligation borne by all witnesses testifying under oath. See 523 Fed. Appx., at 712 (finding immaterial the fact that Lane spoke "pursuant to a subpoena and in the litigation context"). Sworn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth. See, *e.g.,* 18 U. S. C. §1623 (criminalizing false statements under oath in judicial proceedings); *United States* v. *Mandujano*, 425 U. S. 564, 576 (1976) (plurality opinion) ("Perjured testimony is an obvious and flagrant affront to the basic concept of judicial proceedings"). When the person testifying is a public employee, he may bear separate obligations to his employer—for example, an obligation not to show up to court dressed in an unprofessional manner. But any such obligations as an employee are distinct and independent from the obligation, as a citizen, to speak the truth. That independent obligation renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee.

In holding that Lane did not speak as a citizen when he testified, the Eleventh Circuit read *Garcetti* far too broadly. It reasoned that, because Lane learned of the subject matter of his testimony in the course of his employment with CITY, *Garcetti* requires that his testimony be treated as the speech of an employee rather than that of a citizen. See 523 Fed. Appx., at 712. It does not.

The sworn testimony in this case is far removed from the speech at issue in *Garcetti*—an internal memorandum prepared by a deputy district attorney for his supervisors recommending dismissal of a particular prosecution. The *Garcetti* Court held that such speech was made pursuant to the employee's "official responsibilities" because "[w]hen [the employee] went to work and performed the tasks he was paid to perform, [he] acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean that his supervisors were prohibited from evaluating his performance." 547 U. S., at 422, 424.

But *Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment. The *Garcetti* Court made explicit that its holding did not turn on the fact that the memo at issue "concerned the subject matter of [the prosecutor's] employment," because "[t]he First Amendment protects some expressions related to the speaker's job." *Id.*, at 421. In other words, the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

It bears emphasis that our precedents dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment. In *Pickering*, for example, the Court observed that "[t]eachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to

speak out freely on such questions without fear of retaliatory dismissal." 391 U. S., at 572; see also *Garcetti*, 547 U. S., at 421 (recognizing that "[t]he same is true of many other categories of public employees"). Most recently, in *San Diego* v. *Roe*, 543 U. S., at 80, the Court again observed that public employees "are uniquely qualified to comment" on "matters concerning government policies that are of interest to the public at large."

The importance of public employee speech is especially evident in the context of this case: a public corruption scandal. The United States, for example, represents that because "[t]he more than 1000 prosecutions for federal corruption offenses that are brought in a typical year . . . often depend on evidence about activities that government officials undertook while in office," those prosecutions often "require testimony from other government employees." Brief for United States as *Amicus Curiae* 20. It would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim. Such a rule would place public employees who witness corruption in an impossible position, torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs.

Applying these principles, it is clear that Lane's sworn testimony is speech as a citizen.

2

Lane's testimony is also speech on a matter of public concern. Speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the

public.'" *Snyder* v. *Phelps*, 562 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 6–7) (citation omitted). The inquiry turns on the "content, form, and context" of the speech. *Connick*, 461 U. S., at 147–148.

The content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern. See, *e.g., Garcetti*, 547 U. S., at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance"). And the form and context of the speech—sworn testimony in a judicial proceeding—fortify that conclusion. "Unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others." *United States* v. *Alvarez*, 567 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 8–9) (plurality opinion).

\* \* \*

We hold, then, that Lane's truthful sworn testimony at Schmitz' criminal trials is speech as a citizen on a matter of public concern.

B

This does not settle the matter, however. A public employee's sworn testimony is not categorically entitled to First Amendment protection simply because it is speech as a citizen on a matter of public concern. Under *Pickering*, if an employee speaks as a citizen on a matter of public concern, the next question is whether the government had "an adequate justification for treating the employee differ-ently from any other member of the public" based on the government's needs as an employer. *Garcetti*, 547 U. S., at 418.

As discussed previously, we have recognized that gov-ernment employers often have legitimate "interest[s] in

the effective and efficient fulfillment of [their] responsibilities to the public," including "'promot[ing] efficiency and integrity in the discharge of official duties,'" and "'maintain[ing] proper discipline in public service.'" *Connick*, 461 U. S., at 150–151. We have also cautioned, however, that "a stronger showing [of government interests] may be necessary if the employee's speech more substantially involve[s] matters of public concern." *Id.*, at 152.

Here, the employer's side of the *Pickering* scale is entirely empty: Respondents do not assert, and cannot demonstrate, any government interest that tips the balance in their favor. There is no evidence, for example, that Lane's testimony at Schmitz' trials was false or erroneous or that Lane unnecessarily disclosed any sensitive, confidential, or privileged information while testifying.[5] In these circumstances, we conclude that Lane's speech is entitled to protection under the First Amendment. The Eleventh Circuit erred in holding otherwise and dismissing Lane's claim of retaliation on that basis.

## IV

Respondent Franks argues that even if Lane's testimony is protected under the First Amendment, the claims against him in his individual capacity should be dismissed on the basis of qualified immunity. We agree.

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft* v. *al-Kidd*, 563 U. S. ___, ___ (2011) (slip op., at 12). Under this doctrine, courts may not award damages against a government official in his personal capacity unless "the official violated a statutory or constitutional right," and "the right was 'clearly established' at the time of the challenged conduct." *Id.,* at

––––––––––

[5] Of course, quite apart from *Pickering* balancing, wrongdoing that an employee admits to while testifying may be a valid basis for termination or other discipline.

\_\_\_ (slip op., at 3).

The relevant question for qualified immunity purposes is this: Could Franks reasonably have believed, at the time he fired Lane, that a government employer could fire an employee on account of testimony the employee gave, under oath and outside the scope of his ordinary job responsibilities? Eleventh Circuit precedent did not preclude Franks from reasonably holding that belief. And no decision of this Court was sufficiently clear to cast doubt on the controlling Eleventh Circuit precedent.

In dismissing Lane's claim, the Eleventh Circuit relied on its 1998 decision in *Morris* v. *Crow*, 142 F. 3d 1379 (*per curiam*). There, a deputy sheriff sued the sheriff and two other officials, alleging that he had been fired in retaliation for statements he made in an accident report and later giving deposition testimony about his investigation of a fatal car crash between another officer and a citizen. *Id.,* at 1381. In his accident report, the plaintiff noted that the officer was driving more than 130 mph in a 50 mph zone, without using his emergency blue warning light. See *ibid.* The plaintiff later testified to these facts at a deposition in a wrongful death suit against the sheriff's office. *Ibid.* His superiors later fired him. *Ibid.*

The Eleventh Circuit, in a pre-*Garcetti* decision, concluded that the plaintiff's deposition testimony was unprotected. It held that a public employee's speech is protected only when it is "'made primarily in the employee's role as citizen,'" rather than "'primarily in the role of employee.'" *Morris*, 142 F. 3d, at 1382. And it found the plaintiff's deposition testimony to be speech as an employee because it "reiterated the conclusions regarding his observations of the accident" that he "generated in the normal course of [his] duties." *Ibid.* Critically, the court acknowledged—and was unmoved by—the fact that although the plaintiff had investigated the accident and prepared the report pursuant to his official duties, there

was no "evidence that [he] gave deposition testimony for any reason other than in compliance with a subpoena to testify truthfully in the civil suit regarding the . . . accident." *Ibid.* The court further reasoned that the speech could not "be characterized as an attempt to make public comment on sheriff's office policies and procedures, the internal workings of the department, the quality of its employees or upon any issue at all." *Ibid.*

Lane argues that two other Eleventh Circuit precedents put Franks on notice that his conduct violated the First Amendment: *Martinez* v. *Opa-Locka*, 971 F. 2d 708 (1992) (*per curiam*), and *Tindal* v. *Montgomery Cty. Comm'n*, 32 F. 3d 1535 (1994). *Martinez* involved a public employee's subpoenaed testimony before the Opa-Locka City Commission regarding her employer's procurement practices. 971 F. 2d, at 710. The Eleventh Circuit held that her speech was protected, reasoning that it addressed a matter of public concern and that her interest in speaking freely was not outweighed by her employer's interest in providing government services. *Id.,* at 712. It held, further, that the relevant constitutional rules were so clearly established at the time that qualified immunity did not apply. *Id.,* at 713. *Tindal*, decided two years after *Martinez*, involved a public employee's subpoenaed testimony in her co-worker's sexual harassment lawsuit. 32 F. 3d, at 1537–1538. The court again ruled in favor of the employee. It held that the employee's speech touched upon a public concern and that her employer had not offered any evidence that the speech hindered operations. *Id.,* at 1539–1540.

*Morris*, *Martinez*, and *Tindal* represent the landscape of Eleventh Circuit precedent the parties rely on for qualified immunity purposes. If *Martinez* and *Tindal* were controlling in the Eleventh Circuit in 2009, we would agree with Lane that Franks could not reasonably have believed that it was lawful to fire Lane in retaliation for his testimony.

But both cases must be read together with *Morris*, which reasoned—in declining to afford First Amendment protection—that the plaintiff's decision to testify was motivated solely by his desire to comply with a subpoena. The same could be said of Lane's decision to testify. Franks was thus entitled to rely on *Morris* when he fired Lane.[6]

Lane argues that *Morris* is inapplicable because it distinguished *Martinez*, suggesting that *Martinez* survived *Morris*. See *Morris*, 142 F. 3d, at 1382–1383. But this debate over whether *Martinez* or *Morris* applies to Lane's claim only highlights the dispositive point: At the time of Lane's termination, Eleventh Circuit precedent did not provide clear notice that subpoenaed testimony concerning information acquired through public employment is speech of a citizen entitled to First Amendment protection. At best, Lane can demonstrate only a discrepancy in Eleventh Circuit precedent, which is insufficient to defeat the defense of qualified immunity.

Finally, Lane argues that decisions of the Third and Seventh Circuits put Franks on notice that his firing of Lane was unconstitutional. See *Reilly*, 532 F. 3d, at 231 (CA3) (truthful testimony in court is citizen speech protected by the First Amendment); *Morales* v. *Jones*, 494 F. 3d 590, 598 (CA7 2007) (similar). But, as the court below acknowledged, those precedents were in direct conflict with Eleventh Circuit precedent. See 523 Fed. Appx., at 712, n. 3.

There is no doubt that the Eleventh Circuit incorrectly concluded that Lane's testimony was not entitled to First

_____

[6] There is another reason *Morris* undermines *Martinez* and *Tindal*. In *Martinez* and *Tindal*, the Eleventh Circuit asked only whether the speech at issue addressed a matter of public concern. *Morris*, which appeared to anticipate *Garcetti*, asked both whether the speech at issue was speech of an employee (and not a citizen) and whether it touched upon a matter of public concern. In this respect, one could read *Morris* as cabining *Martinez* and *Tindal*.

Amendment protection. But because the question was not "beyond debate" at the time Franks acted, *al-Kidd*, 563 U. S., at \_\_\_ (slip op., at 9), Franks is entitled to qualified immunity.

V

Lane's speech is entitled to First Amendment protection, but because respondent Franks is entitled to qualified immunity, we affirm the judgment of the Eleventh Circuit as to the claims against Franks in his individual capacity. Our decision does not resolve, however, the claims against Burrow—initially brought against Franks when he served as President of CACC—in her official capacity. Although the District Court dismissed those claims for prospective relief as barred by the Eleventh Amendment, the Eleventh Circuit declined to consider that question on appeal, see 523 Fed. Appx., at 711 ("Because Lane has failed to establish a *prima facie* case of retaliation, we do not decide about Franks' defense of sovereign immunity"), and the parties have not asked us to consider it now. We therefore reverse the judgment of the Eleventh Circuit as to those claims and remand for further proceedings.

\*    \*    \*

For the foregoing reasons, the judgment of the United States Court of Appeals for the Eleventh Circuit is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–483

_____

EDWARD R. LANE, PETITIONER *v.* STEVE FRANKS,
IN HIS INDIVIDUAL CAPACITY, AND SUSAN BURROW,
IN HER OFFICIAL CAPACITY AS ACTING
PRESIDENT OF CENTRAL
ALABAMA COMMUNITY
COLLEGE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[June 19, 2014]

JUSTICE THOMAS, with whom JUSTICE SCALIA and
JUSTICE ALITO join, concurring.

This case presents the discrete question whether a
public employee speaks "as a citizen on a matter of public
concern," *Garcetti* v. *Ceballos*, 547 U. S. 410, 418 (2006),
when the employee gives "[t]ruthful testimony under oath
. . . outside the scope of his ordinary job duties," *ante*, at 9.
Answering that question requires little more than a
straightforward application of *Garcetti*. There, we held
that when a public employee speaks "pursuant to" his
official duties, he is not speaking "as a citizen," and First
Amendment protection is unavailable. 547 U. S., at 421–
422. The petitioner in this case did not speak "pursuant
to" his ordinary job duties because his responsibilities did
not include testifying in court proceedings, see *ante*, at 8,
n. 4, and no party has suggested that he was subpoenaed
as a representative of his employer, see Fed. Rule Civ.
Proc. 30(b)(6) (requiring subpoenaed organizations to
designate witnesses to testify on their behalf). Because
petitioner did not testify to "fulfil[l] a [work] responsibil-
ity," *Garcetti*, *supra,* at 421, he spoke "as a citizen," not as

an employee.

We accordingly have no occasion to address the quite different question whether a public employee speaks "as a citizen" when he testifies in the course of his ordinary job responsibilities. See *ante*, at 8, n. 4. For some public employees—such as police officers, crime scene technicians, and laboratory analysts—testifying is a routine and critical part of their employment duties. Others may be called to testify in the context of particular litigation as the designated representatives of their employers. See Fed. Rule Civ. Proc. 30(b)(6). The Court properly leaves the constitutional questions raised by these scenarios for another day.