**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 12, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ROBERT ELLISON,

     Plaintiff - Appellant,

v.

ROOSEVELT COUNTY BOARD OF
COUNTY COMMISSIONERS, a political
sub-division existing under the laws of the
State of New Mexico; ROOSEVELT
COUNTY SHERIFF'S OFFICE, a political
sub-division of the State of New Mexico;
MALIN PARKER; JAVIER SANCHEZ,
individually,

     Defendants - Appellees.

No. 16-2270
(D.C. No. 2:16-CV-00415-GBW-GJF)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY**, **BALDOCK**, and **BRISCOE**, Circuit Judges.
_____

    Robert Ellison was terminated from his position as a deputy sheriff with the

Roosevelt County Sheriff's Office. Afterwards, he brought this action under

42 U.S.C. § 1983, alleging he was wrongfully discharged in violation of his First and

---

    [*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Fourteenth Amendment rights. A magistrate judge acting with the consent of the parties, *see* 28 U.S.C. § 636(c), dismissed the claims under Federal Rule of Civil Procedure 12(b)(6) and denied as futile Mr. Ellison's motion to file a second amended complaint. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.[1]

## I

According to the first amended complaint, Mr. Ellison was fired for arresting his supervisor's acquaintance, reporting another officer's misconduct, and generally refusing to cover up wrongdoing at the Roosevelt County Sheriff's Office. The arrest occurred on March 24, 2016, when Mr. Ellison stopped Julian Aranda for alleged traffic violations. Mr. Aranda allegedly resisted and threatened to kill Mr. Ellison and his family. As a consequence, Mr. Ellison arrested him for aggravated assault and battery on an officer.

Later that day, Deputy Sheriff Christopher McCasland spoke to Mr. Ellison in the parking lot at the Roosevelt County Detention Center. He told Mr. Ellison that he had intentionally injured a detainee while employed at another law enforcement agency. He laughed as he told Mr. Ellison about transferring the detainee in his vehicle and slamming on the vehicle's brakes, causing the detainee to hit his head.

On March 27, 2016, Mr. Aranda complained to Lt. Javier Sanchez that Mr. Ellison used excessive force and drew his weapon during the March 24 traffic stop. Lt. Sanchez, who has social connections to the Aranda family, neither told

---

[1] The magistrate judge declined to exercise supplemental jurisdiction over a state-law whistleblower claim, but Mr. Ellison does not appeal that ruling.

Mr. Ellison about the excessive-force complaint nor interviewed him about Mr. Aranda's allegations. Lt. Sanchez concluded the stop was illegal, however, and when he spoke to Mr. Ellison about it, Mr. Ellison disagreed with his conclusion in front of another officer.

On April 1 or 2, 2016, Mr. Ellison had another conversation with Deputy McCasland. This time, Mr. Ellison recorded his discussion with Deputy McCasland, who again admitted to intentionally injuring the detainee, though he claimed he was a rookie and did not know better. Deputy McCasland hinted that the story was a secret; he also said he was "best friends" with Lt. Sanchez. Aplt. App. at 89.

On April 5, Mr. Ellison reported Deputy McCasland's alleged misconduct to Sergeant Mark Morrison, who told Mr. Ellison that he would "bring it up with [Lt.] Sanchez." *Id.*

Eight days later, on April 13, Lt. Sanchez informed Mr. Ellison that he was fired. Along with a separation notice, Lt. Sanchez provided Mr. Ellison with an employee performance report and a written statement, all of which defendants attached to their motion to dismiss. Mr. Ellison alleged the written statement falsely claimed he was fired for poor job performance, making an arrest without probable cause, preparing a police report that was inconsistent with a video of the arrest, filing charges against Mr. Aranda that "should have never been filed," and engaging "in illegal and unprofessional conduct by intentionally falsif[ying] a police report." *Id.* at 90-91 (internal quotation marks omitted). Mr. Ellison averred that these documents were given to the human resources administrator, the county contract

3

attorney, and "other third parties." *Id.* at 91. He also alleged that Lt. Sanchez told him he was not "fitting in," meaning he was not engaging in illegal or improper conduct and instead was violating the "blue wall of silence." *Id.* (internal quotation marks omitted). Further, Mr. Ellison alleged that the Roosevelt County Board of Commissioners and Roosevelt County Sheriff acted under state law, local ordinance, custom, procedure, and/or policy to deny him his constitutional rights. Although he cited ten alleged instances of misconduct committed by officers toward other individuals, he did not specifically raise an independent municipal liability claim.

Instead, based on these allegations, Mr. Ellison averred that defendants violated his First and Fourteenth Amendment rights. In particular, he claimed that his First Amendment rights were violated because he was fired for engaging in two instances of protected speech: (1) opposing Lt. Sanchez's attempt to deny the legality of the Aranda arrest and (2) reporting Deputy McCasland's conduct.[2] As for his Fourteenth Amendment claim, he averred that defendants deprived him of his liberty interests in his professional reputation and future employment opportunities. In particular, Mr. Ellison alleged he was dismissed based on false, misleading, and/or incomplete information that stigmatized his reputation and diminished his standing in the community. He cited, for example, two job applications that he submitted to other law enforcement agencies, which he alleged were declined due to "the bogus 'Employee Performance Report.'" *Id.* at 99.

---

[2] Mr. Ellison also alleged he was fired for refusing to condone other wrongdoing, but he has abandoned that theory on appeal.

The magistrate judge dismissed the complaint under Fed. R. Civ. P 12(b)(6), ruling that Mr. Ellison failed to plausibly allege a First Amendment claim because his allegations established that he spoke pursuant to his official duties, which is not protected speech. Further, the magistrate judge determined that he failed to plausibly allege a Fourteenth Amendment claim because he alleged that the termination documents (the separation notice, the job performance report, and Lt. Sanchez's written statement) were disclosed to other government personnel but not the public. Moreover, in evaluating Lt. Sanchez's written statement, which defendants attached to their motion to dismiss, the magistrate judge determined it was not sufficiently stigmatizing to trigger Fourteenth Amendment concerns.[3] The magistrate judge ruled that, contrary to Mr. Ellison's characterization, the statement did not accuse him of falsifying a police report but instead indicated that he had poor job performance and was negligent in preparing his paperwork. Consequently, the magistrate judge dismissed the complaint and denied as futile Mr. Ellison's motion to amend.

II

"We review a dismissal under Rule 12(b)(6) de novo." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) (internal quotation marks omitted). "Our function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is

---

[3] In ruling on a 12(b)(6) motion, "[i]n addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

5

legally sufficient to state a claim for which relief may be granted." *Id.* (internal quotation marks omitted). We evaluate whether the complaint states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating a claim for plausibility, we accept as true all well-pleaded allegations and view them in the light most favorable to the non-moving party. *Colby v. Herrick*, 849 F.3d 1273, 1279 (10th Cir. 2017).

### A. First Amendment

As a public employee, Mr. Ellison "enjoyed First Amendment rights, but not to the same extent as a private citizen." *Seifert v. Unified Gov't of Wyandotte Cty.*, 779 F.3d 1141, 1151 (10th Cir. 2015). "[T]he First Amendment protection of a public employee's speech depends on a careful balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014) (brackets and internal quotation marks omitted). "Because government employers, like private employers, need a significant degree of control over their employees' words and actions, not every restriction on a public employee's speech amounts to a deprivation of First Amendment rights." *Seifert*, 779 F.3d at 1151 (citation, brackets, and internal quotation marks omitted).

"The familiar *Garcetti/Pickering* analysis governs First Amendment retaliation claims." *Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1367 (10th Cir. 2015)

6

(internal quotation marks omitted); *see Garcetti v. Ceballos*, 547 U.S. 410 (2006);

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Under this analysis, we consider:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interest, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017) (internal quotation

marks omitted). "The first three steps concern questions of law for the courts, and

the last two concern questions of fact." *Id.* at 1222.

The magistrate judge resolved this claim at the first step, concluding that

Mr. Ellison's allegations established that the two instances of speech upon which his

claim was based—(1) his discussion of the legality of the Aranda arrest and (2) his

report of Deputy McCasland's misconduct—were both made pursuant to his official

duties. Mr. Ellison disputes this conclusion and argues that in both instances, he was

speaking outside of his chain of command and thus outside of his official duties.

It is well-established that "when public employees make statements pursuant

to their official duties, the employees are not speaking as citizens for First

Amendment purposes, and the Constitution does not insulate their communications

from employer discipline." *Seifert*, 779 F.3d at 1151 (internal quotation marks

omitted). We take "a practical view of all the facts and circumstances surrounding

the speech and the employment relationship" and "a broad view of the meaning of

7

speech that is pursuant to an employee's official duties." *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010) (internal quotation marks omitted). Although "no one factor is dispositive," our "guiding principle is that speech is made pursuant to official duties if it involves 'the type of activities that the employee was paid to do.'" *Id.* (brackets omitted) (quoting *Green v. Bd. of Cty. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007)).

### 1. *Mr. Ellison's Views on the Aranda Arrest*

Mr. Ellison alleged that he "spoke briefly" to Lt. Sanchez about the legality of the Aranda traffic stop in front of another officer. Aplt. App. at 87. He did not describe where or when this discussion occurred, but he alleged that Lt. Sanchez "claimed that [Mr. Ellison] had made up the reasons for the stop even though the incident . . . was on video." *Id.* Although Lt. Sanchez concluded "the whole traffic stop was not legal," Mr. Ellison "disagreed with [Lt.] Sanchez's analysis in front of" the other officer, who agreed with Mr. Ellison that he had reasonable suspicion to initiate the stop. *Id.* at 88.

Given these limited factual allegations, the magistrate judge correctly concluded that Mr. Ellison was speaking pursuant to his official duties. Mr. Ellison was one of three officers discussing whether there was reasonable suspicion to stop a vehicle. Taking a practical view, this was among the types of activities Mr. Ellison was paid to do. He was a deputy sheriff charged with enforcing the traffic laws, knowing the legal grounds for initiating a stop, and executing lawful arrests. His lieutenant told him the stop was unlawful, and Mr. Ellison attempted to challenge

8

that analysis. As best we can tell from the allegations, this was speech made "during the course of performing an official duty [aimed at] facilitat[ing] the employee's performance of the official duty." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007). Mr. Ellison disputes this conclusion because he disagreed with Lt. Sanchez, but his disagreement was inconsequential because a "government employee's First Amendment rights do not invest them with a right to perform their jobs however they see fit," *Green*, 472 F.3d at 801 (internal quotation marks omitted).

Neither does Mr. Ellison's chain-of-command argument alter this conclusion. He contends that under the Ninth Circuit's decision in *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013), if an officer speaks outside his chain of command, it is "unlikely that he is speaking pursuant to his duties." Our cases certainly recognize this principle. *See, e.g., Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 747 (10th Cir. 2010) (recognizing that "speech directed at an individual or entity outside of an employee's chain of command is often outside of an employee's official duties"). But the allegations here do not suggest Mr. Ellison was speaking outside his chain of command. He was speaking to Lt. Sanchez, who had a higher rank, who completed his job performance report, and who Mr. Ellison identifies in his appellate brief as "his supervisor[]," Aplt. Br. at 21. This speech to his supervisor, who surely was within his chain of command, tends to show that Mr. Ellison was indeed speaking pursuant to his official duties. *See Rohrbough*, 596 F.3d at 747 ("By contrast, speech directed at an individual or entity within an employee's chain of

9

command is often found to be pursuant to that employee's official duties under *Garcetti/Pickering*.").

### 2. *Mr. Ellison's Misconduct Report on Deputy McCasland*

Mr. Ellison also alleged that he reported Deputy McCasland's story about injuring a detainee to Sgt. Morrison. Apart from alleging that he was acting "as a citizen" in reporting on "matters of public concern," Aplt. App. at 89, which are legal conclusions we need not accept as true, *see Iqbal*, 556 U.S. at 678, Mr. Ellison claimed he reported another officer's illegal conduct. Specifically, he alleged that Deputy McCasland told him about the misconduct at the county detention center, and by reporting it he violated the sheriff's office policy of maintaining a "blue wall of silence," Aplt. App. at 89 (internal quotation marks omitted).

These allegations do not suggest Mr. Ellison was acting as a citizen reporting on a matter of public concern. While not dispositive, his allegation that he learned about another sheriff deputy's misconduct at the county detention center indicates that the subject matter of his speech was related to his employment. Further, we have identified "[a]s examples of protected government employee speech" "communicating with newspapers or legislators or performing some similar activity afforded citizens." *Rohrbough*, 596 F.3d at 746 (ellipsis and internal quotation marks omitted). Mr. Ellison did no such thing. Rather, he communicated the alleged misconduct to Sgt. Morrison, who appears to have been a superior officer and who in turn "stated he would bring it up with [Lt.] Sanchez." Aplt. App. at 89. These allegations indicate that Mr. Ellison's report of employment-related misconduct went

10

straight up the chain of command, which signals that it was unprotected speech made pursuant to his official duties. *See Rohrbough*, 596 F.3d at 747.

That Mr. Ellison violated the policy of silence by reporting the misconduct rather than acquiescing to the policy does not automatically mean his speech was outside the scope of his official duties. *See id.* ("[T]he court has not foreclosed unauthorized speech or speech not explicitly required as part of an employee's day-to-day job from being within the scope of that employee's official duties under *Garcetti/Pickering*." (brackets and internal quotation marks omitted)); *Green*, 472 F.3d at 800-01 (holding that drug lab employee's disagreement with her supervisors concerning the need for a formal testing policy and her unauthorized procurement of a test to confirm the need for such a policy were pursuant to her official duties). Accepting as true Mr. Ellison's allegation that he was not authorized to report Deputy McCasland's misconduct, the report was still made within his chain of command and the scope of his official duties. The magistrate judge correctly dismissed the First Amendment claim.

*B. Fourteenth Amendment*

We next consider Mr. Ellison's Fourteenth Amendment claim. Under the Fourteenth Amendment, "[a] public employee has a liberty interest in his good name and reputation as they relate to his continued employment." *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014). "The government infringes upon that interest when: (1) it makes a statement that impugns the good name, reputation, honor, or integrity of the employee; (2) the statement is false; (3) the statement is made during

11

the course of termination *and* forecloses other employment opportunities; and (4) the statement is published, in other words disclosed publically." *Id.* (brackets, footnote, and internal quotation marks omitted). "These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest." *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994).

The magistrate judge concluded that Mr. Ellison failed to plead a sufficiently stigmatizing statement that impugned his good name or that such a statement was published. These conclusions concern the first and fourth elements described above. We therefore confine our analysis to those elements.

*1. Stigma*

Mr. Ellison contends his job performance report and Lt. Sanchez's written statement infringed his liberty interests by accusing him of falsifying a police report and engaging in illegal and unprofessional conduct. He insists the complaint alleges sufficiently stigmatizing statements and the magistrate judge made impermissible factual findings based on his independent reading of the performance report and Lt. Sanchez's written statement.

> Although the sufficiency of a complaint must rest on its contents alone, there are exceptions to this restriction on what the court can consider, but they are quite limited: (1) documents that the complaint incorporates by reference; (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity; and (3) matters of which a court may take judicial notice.

*Wasatch Equality v. Alta Ski Lifts Co.*, 820 F.3d 381, 386 (10th Cir. 2016) (brackets and internal quotation marks omitted).

12

There is no merit to Mr. Ellison's assertion that the magistrate judge made impermissible factual findings based on his independent review of the performance report and Lt. Sanchez's written statement, which defendants attached to their motion to dismiss. These documents were referenced in the complaint and they are central to Mr. Ellison's claim. He does not dispute the documents' authenticity, nor did he contest the magistrate judge's consideration of these materials in his response to the motion to dismiss, *see* Aplt. App. at 191-92.[4] And we, like the magistrate judge, have previously examined a similar report containing allegedly stigmatizing statements. *See Se. Kan. Cmty. Action Program Inc. v. Sec'y of Agric.*, 967 F.2d 1452, 1458 (10th Cir. 1992). There was no error in evaluating these documents.

The magistrate judge also correctly determined that the performance report and Lt. Sanchez's written statement do not contain sufficiently stigmatizing information implicating Mr. Ellison's liberty interests. Accusing an officer of filing a false police report is sufficiently stigmatizing to impugn his or her good name, reputation, honor, or integrity. *See Palmer v. City of Monticello*, 31 F.3d 1499, 1503 (10th Cir. 1994) ("We are satisfied that an accusation that a police officer falsified a speeding ticket qualifies as a stigmatizing charge which amply supports that element of a liberty interest."). But "charges involving negligence and neglect of duties . . . are insufficient to establish a liberty interest deprivation." *Se. Kan. Cmty. Action*

---

[4] We cite the hard copy of Mr. Ellison's appendix due to formatting distortions in the electronically filed version. Although the hard copy contains one page that was not bates-stamped (between pages 131 and 132), our citations conform to the hard copy's pagination.

*Program Inc.*, 967 F.2d at 1458. Likewise, a claim that an officer failed to conduct an investigation to the satisfaction of his supervisor is not sufficiently stigmatizing. *See Bailey v. Kirk*, 777 F.2d 567, 572-73 (10th Cir. 1985). Nor are derogatory statements that a public employee was "a slow worker with poor work habits and low productivity" sufficient to implicate his or her liberty interests. *Stritzl v. U.S. Postal Serv.*, 602 F.2d 249, 252 (10th Cir. 1979) (internal quotation marks omitted).

Mr. Ellison's situation is analogous to those cases involving negligence and poor job performance. His performance report indicates that his separation was due to "Poor Job Performance." Aplt. App. at 150. It reflects that he received verbal training within the previous twelve months, and it references Lt. Sanchez's written statement to explain the specific event or behavior that led to his termination. In Lt. Sanchez's written statement, Lt. Sanchez describes Mr. Aranda's complaint of excessive force and Mr. Ellison's claimed reason for the traffic stop—Mr. Aranda's failure to properly use a turn signal. Lt. Sanchez states that he compared the police report prepared by Mr. Ellison with a video of the stop, and he found the following inconsistencies between the two:

First, as noted by Lt. Sanchez, Mr. Ellison indicated in his police report that Mr. Aranda failed to signal his intentions within 100 feet of an intersection on two separate occasions. Although Lt. Sanchez had previously instructed Mr. Ellison that failure to use a turn signal must affect the normal flow of traffic to be a traffic violation, the video showed that Mr. Aranda did not affect the normal flow of traffic to justify the stop.

14

Second, Mr. Ellison's police report indicated that Mr. Aranda traveled four city blocks and then turned west for approximately 1/8 of a mile, but the video showed that after Mr. Ellison activated his emergency equipment, Mr. Aranda traveled only two blocks and then turned west without traveling 1/8 of a mile.

Third, Lt. Sanchez stated the video was inconsistent with Mr. Aranda striking Mr. Ellison on the left arm, as indicated in his police report; instead, it appeared Mr. Aranda pulled away and resisted while Mr. Ellison attempted to gain compliance.

Last, Lt. Sanchez found inconsistent charges included on Mr. Ellison's booking form and the criminal complaint he filed against Mr. Aranda. Given these inconsistencies, Lt. Sanchez admonished Mr. Ellison that they had "spoken about attention to detail [in] your paperwork on numerous occasions (court paperwork not correct and having to amend numerous complaints)." *Id.* at 151-52. He also stated that Mr. Ellison charged Mr. Aranda with "violations that should have never been filed." *Id.* at 152.

These charges fault Mr. Ellison for poor performance and failing to execute his professional responsibilities to the satisfaction of his supervisor, which under these circumstances, are not sufficiently stigmatizing to raise Fourteenth Amendment concerns.

### 2. *Publication*

Because Mr. Ellison cannot satisfy the first element of his claim, we need not consider whether he satisfies the publication element. Nevertheless, Mr. Ellison insists that negative information was published because his performance report was

15

available to other law enforcement agencies, presumably through his personnel file. We have noted "that the presence of false and defamatory information in an employee's personnel file may constitute 'publication' if not restricted for internal use." *Bailey*, 777 F.2d at 580 n.18. But the operative complaint here does not allege the information was unrestricted. Rather, it alleges only that the separation notice and performance report "were provided to the Human Resources Administrator, the County contract attorney along with other third parties." Aplt. App. at 91. As the magistrate judge correctly recognized, these allegations fail to plausibly allege publication because "intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication: 'to be made public.'" *Asbill v. Hous. Auth. of Choctaw Nation of Okla.*, 726 F.2d 1499, 1503 (10th Cir. 1984) (citing *Bishop v. Wood*, 426 U.S. 341, 348 (1976)). Although Mr. Ellison references his two declined job applications, this fails to show publication because he does not allege that defendants provided that information to the other law enforcement agencies. Rather, the complaint merely asserts these agencies "turned [him] down in part because of the allegations contained in the bogus Employee Performance Report." Aplt. App. at 99 (internal quotation marks omitted). To the extent Mr. Ellison contends he satisfies the publication element because he alleged information was disclosed to unidentified other third parties, including, apparently, "detention center personnel," Aplt. App. at 87, we disagree. It was his obligation to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

16

alleged," *Iqbal*, 556 U.S. at 678.  Mr. Ellison failed to plead a plausible Fourteenth Amendment claim, and the district court correctly dismissed it.

### C. Futility of Amendment

Lastly, Mr. Ellison contends the magistrate judge erred in denying his motion to file a second amended complaint.  "[L]eave to amend should be freely given when justice so requires, but a district court may dismiss without granting leave to amend when it would be futile to allow the plaintiff an opportunity to amend [his] complaint."  *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1151 (10th Cir. 2013) (ellipsis, brackets, and internal quotation marks omitted).  "Although we generally review for abuse of discretion a district court's denial of leave to amend a complaint, when this denial is based on a determination that amendment would be futile, our review for abuse of discretion includes de novo review of the legal basis for the finding of futility."  *Cohen v. Longshore*, 621 F.3d 1311, 1314 (10th Cir. 2010) (internal quotation marks omitted).

Mr. Ellison sought to file a second amended complaint to add two allegations, both of which we agree would have been futile.  His first proposed allegation was that when he told Sgt. Morrison that he recorded a conversation with Deputy McCasland, Sgt. Morrison replied that audio and video recordings of the encounter were "against policy," but he would bring it up with Lt. Sanchez.  Aplt. App. at 222 (internal quotation marks omitted).  This allegation aimed to support Mr. Ellison's municipal liability theory, but it did nothing to cure the pleading defects in the underlying constitutional claims.  *See Ellis ex rel. Estate of Ellis v. Ogden City*,

17

589 F.3d 1099, 1104 (10th Cir. 2009) ("[L]iability will not attach where there was no underlying constitutional violation by any of the municipality's officers." (brackets and internal quotation marks omitted)). Consequently, allowing this proposed allegation would indeed have been futile.

Mr. Ellison's second proposed amendment alleged that he alerted another law enforcement agency of Deputy McCasland's misconduct, which was not part of his normal duties. This allegation aimed to cure the pleading defect in his First Amendment claim by establishing that he was speaking outside of his official duties in reporting Deputy McCasland's misconduct to another police department. But this proposed amendment is unavailing because the contours of protected speech are defined not simply by the agency to which a report of impropriety is made, but (at least in part) by the scope of the employee's official duties. *See Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1332 (10th Cir. 2007).

In *Casey*, a school superintendent reported violations of the federal Head Start program to her supervising school board and the governing federal agency; she also reported violations of the state open meetings law, both to the school board and the state attorney general's office. *Id.* at 1326. We determined her reports to the school board and the federal Head Start agency were pursuant to her official duties to oversee the Head Start program and provide candid advice and counsel to the school board. *Id.* at 1329, 1331-32. But the superintendent's report of the board's violation of the open meetings law to the state attorney general's office was not pursuant to her

18

official duties, and thus survived the Supreme Court's decision in *Garcetti*. *Id.* at 1332-33.

Here, taking a practical view of the circumstances of Mr. Ellison's report, and a broad view of speech that was pursuant to his official duties, we conclude his report of misconduct to another law enforcement agency still fell within the scope of his job responsibilities. Mr. Ellison was a deputy sheriff with evidence of improper conduct committed by another officer while employed at a different law enforcement agency. He allegedly obtained this information through his employment as a deputy sheriff and in that capacity, first reported it internally up his chain of command. The next day he reported it to another law enforcement agency, but this alone was insufficient to remove the speech from the purview of his official duties. *See id.* at 1331-32. Because this proposed amendment would not have cured the pleading defect in Mr. Ellison's First Amendment claim, the magistrate judge correctly denied the motion to amend as futile.

## III

The judgement of the district court is affirmed.


Entered for the Court


Bobby R. Baldock
Circuit Judge