# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-4019

_____

Gerald H. Groenewold, Ph.D.

*Plaintiff - Appellant*

v.

Robert O. Kelley, Ph.D., president of the University of North Dakota, an institution within the North Dakota University System, in his individual capacity and alternatively and consecutively, in his official capacity; North Dakota State Board of Higher Education, an entity of state statutory and constitutional dimension, which sets policy for all colleges and universities within the North Dakota University System

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of North Dakota - Fargo

_____

Submitted: December 13, 2017
Filed: April 24, 2018

_____

Before WOLLMAN, LOKEN, and MELLOY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Gerald Groenewold, Ph.D., former Director of the Energy and Environmental Research Center (the Center) at the University of North Dakota (University) sued

University President Robert O. Kelley, Ph.D., in his individual and official capacities and the North Dakota State Board of Higher Education (Board), challenging the termination of his employment. Dr. Groenewold claimed that defendants retaliated against him for exercising his First Amendment free speech rights and violated his Fourteenth Amendment due process rights. The district court[1] granted defendants' motion to dismiss, holding that Dr. Groenewold failed to allege a constitutional violation. We conclude, based on the facts assumed by the district court, that the motion was properly granted.

## I. Background

Dr. Groenewold began working full-time for the University in 1983. He served as the director of the Center from 1987 until his termination in 2014. Dr. Groenewold had a good working relationship with the University's presidents until 2010, when conflict arose with President Kelley, who had become president in 2008.

In August 2010, Dr. Groenewold received a disciplinary letter from President Kelley regarding negative statements that Dr. Groenewold had allegedly made about other University employees. The letter stated that Dr. Groenewold's "continued expressions of contempt [for others] will result in disciplinary action, including possible dismissal from the University of North Dakota." Dr. Groenewold apologized for making inappropriate personal comments, but refused to sign the letter. President Kelley withdrew his threat to dismiss Dr. Groenewold.

In May 2011, the University unilaterally changed its agreement with the Center's Foundation so that ten percent of the Center's licensing revenue would be

_____

[1]The Honorable Ralph R. Erickson, then Chief Judge, United States District Court for District of North Dakota, now Circuit Judge for the United States Court of Appeals for the Eighth Circuit.

deposited into the University's general funding, rather than being sent directly to the Center. The Center's Foundation contested the change, resulting in tension between the Foundation and the University. Dr. Groenewold contends that he tried to be a "broker" between the President's office and the Foundation, a role that "often caused difficulty in his relationship with [President] Kelley."

Another dispute arose later that year when both the Center and the University's athletic department wanted to acquire the same piece of real estate. Because neither entity had the financial resources to pay for demolition of the property's existing structures, the decision about who would obtain the property was deferred to President Kelley. A North Dakota state legislator familiar with the situation introduced a bill that would require the University's president to defer to the director of the Center in his decision making, essentially giving "Dr. Groenewold a right of first refusal to the use of real estate." Upon learning about the bill, President Kelley threatened to terminate Dr. Groenewold for insubordination and drafted a termination letter that was never completed or delivered. Dr. Groenewold denied having had any involvement with the bill.

In 2013, Dr. Groenewold failed to timely report the Center's budget deficit to President Kelley. Under the Board's policy, the University is required to report any budget variances or deficits of more than four percent twice each year (once in January and once in June). In January 2013, Center Associate Director Tom Erickson proposed submitting a report anticipating a five to ten percent budget deficit, which he expected to materialize by June 2013. Dr. Groenewold rejected Erickson's proposal and did not submit a report, believing that he would be able to eliminate the deficit by completing a number of projects. The projects remained incomplete five weeks after the reporting deadline, whereupon Dr. Groenewold reported the deficit to President Kelley.

The Center was still experiencing budget shortfalls in 2014. Associate Director Erickson drafted a memorandum to President Kelley outlining how much money it would take to make the Center whole. Dr. Groenewold also made requests from January 2014 through April 2014 to discuss the issue with President Kelley, all of which Kelley declined.

On April 16, 2014, the Board's Budget and Finance Committee held a meeting to discuss the Center's budget. The University's Vice President of Finance stated that President Kelley had yet to act on the issue because it had "broader financial implications for the university." The next day, the Grand Forks Herald reported that the Center had had a deficit every year since 2010 and that the Board's Budget Committee Chairman Duaine Espegard was displeased with the Center. According to the article, Espegard opined that the Center has "got to make some changes."

Dr. Groenewold was aware of a Board policy prohibiting University employees from presenting issues to the full Board or any committee thereof without first going through the President. Notwithstanding that knowledge, he called Espegard to discuss the University's requirement that the Center be responsible for its own legal fees and the conflict regarding the allocation of the University's funding, as well as "to seek his advice as to how best to elevate his perspective on the matter to the attention of the [Board]." Espegard was unavailable at the moment, but promised to call Dr. Groenewold the following week to set up a meeting. Dr. Groenewold then sent Espegard an email, with a copy to President Kelley, stating in part, "We are appreciative of your request to visit with us regarding [the Center's] financials. We are hoping that you find time next week to do so." Espegard did not meet with Dr. Groenewold and instead sent him the following message via email:

> Please understand that I or (sic) the committee did not request a meeting
> to discuss your financials. The only communication with the [Center]
> was your phone call last Friday requesting that I visit. The budget

committee, of which I am chair, has requested that the University provide a plan to eliminate the variance that is reported. It is not the boards (sic) duty or responsibility to get involved in the management of your department.

Espegard also contacted President Kelley and the University Chancellor to inform them of his communications with Dr. Groenewold. By memorandum dated April 28, 2014, Dr. Groenewold informed President Kelley that he wanted to speak with Espegard to clarify information from the newspaper article. Dr. Groenewold received a letter from President Kelley one week later informing him that he was being placed on administrative leave.

On May 23, 2014, President Kelley sent Dr. Groenewold a second letter stating that it was his intention to dismiss him for cause and setting forth the following reasons: that Dr. Groenewold deliberately provided false information regarding the Center to the University; that he withheld material information regarding the Center from the University; that he directed Center employees to submit materially false information regarding the Center to the University; that he deliberately provided false and misleading information for Center employees and the public regarding the University's financial support of the Center; that he created an inappropriate and abusive work environment; that he engaged in discriminatory conduct toward one of the University's Vice Presidents; that he acted fiscally irresponsible; that he was untruthful with President Kelley; and that he was insubordinate. The letter set forth twenty-five examples of Dr. Groenewold's alleged behavior. Finally, the letter informed Dr. Groenewold that he was entitled to five days notice of President Kelley's intent to dismiss him.

Dr. Groenewold responded on May 28, 2014, by sending President Kelley a letter denying all of the allegations in the latter's May 23, 2014, letter and requesting that President Kelley conduct a pre-termination review and thereafter reconsider his position. A pre-termination review was conducted on May 30, 2014, by

administrative hearing officer and former University employee, Fred MacGregor, who concluded that there were reasonable grounds to dismiss Dr. Groenewold. Later that day, President Kelley sent Dr. Groenewold a letter terminating his employment and notifying him of his right to appeal.[2] Dr. Groenewold then sent a timely letter of appeal to President Kelley.

A hearing was thereafter scheduled and Administrative Law Judge Bonnie Fetch was appointed as the hearing officer. After the first pre-hearing conference, ALJ Fetch denied Dr. Groenewold's request that the parties be required to apply the federal rules of civil procedure and the federal rules of evidence. Dr. Groenewold also requested that the Board agree in writing that either the Board itself or the University's Chancellor would be the final decision maker. The University's outside counsel orally agreed to this, but declined to secure a written commitment to that effect. ALJ Fetch noted that she had no authority to change the Board's policy and could not compel the Board to agree to designate the Chancellor as the final decision maker. Dr. Groenewold did not attend the second pre-hearing conference, but instead abandoned his administrative appeal and filed this lawsuit.

The district court granted defendants' motion to dismiss, concluding that Dr. Groenewold had failed to allege a constitutional violation. In doing so, the court concluded that Dr. Groenewold's speech was unprotected, that his pre-termination procedural due process rights were not violated, that he waived his post-termination procedural due process rights when he voluntarily dropped his administrative appeal, and that his substantive due process rights were not violated. The court further held that President Kelley was entitled to qualified immunity in his individual capacity and

---

[2]Policy 608.2(4) provides that after termination an employee has 20 days to appeal. It also states that either President Kelley or the University Chancellor shall appoint an officer to conduct an evidentiary hearing and make findings. After the hearing is complete, the hearing officer is to make a recommendation and the University President or Chancellor is to make a final decision.

that although not immune from suit under the Eleventh Amendment, neither the Board nor Kelley was liable for any constitutional violations in their official capacities.

## II. Discussion

We review *de novo* the grant of a motion to dismiss based on qualified immunity. Scott v. Baldwin, 720 F.3d 1034, 1036 (8th Cir. 2013) (standard of review). To determine if an official is entitled to qualified immunity, we must determine whether "the alleged facts demonstrate that the official's conduct violated a constitutional right," and "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Clemmons v. Armontrout, 477 F.3d 962, 965 (8th Cir. 2007) (quotations omitted); see also Sutton v. Bailey, 702 F.3d 444, 447 (8th Cir. 2012) (stating that "a right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right") (quotation and alteration omitted). It is within our discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Fields v. Abbott, 652 F.3d 886, 890 (8th Cir. 2011) (quoting Pearson v. Callahan, 555 U.S. 223, 236 (2009)). If we conclude that the alleged facts do not violate a constitutional right, then we need not address the second inquiry, and the defendant will be entitled to qualified immunity. Clemmons, 477 F.3d at 965 (citing Moore v. Briggs, 381 F.3d 771, 773 (8th Cir. 2004)).

To establish a claim for employer retaliation under the First Amendment, Dr. Groenewold must show that "he engaged in activity protected by the First Amendment." Lyons v. Vaught, 875 F.3d 1168, 1172 (8th Cir. 2017) (Lyons II) (quoting Lyons v. Vaught, 781 F.3d 958, 961 (8th Cir. 2015)). A public employee's speech is protected under the First Amendment if he spoke as a citizen on a matter of public concern, but a public employee's speech is not protected if he spoke pursuant

to his official duties. Buehrle v. City of O'Fallon, 695 F.3d 807, 811-12 (8th Cir. 2012); see Garcetti v. Ceballos, 547 U.S. 410, 418, 421 (2006) (stating that when public employees speak on a matter of public concern pursuant to their official duties, "the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline"). The critical question is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lyons II, 875 F.3d at 1173 (quoting Lane v. Franks, 134 S. Ct. 2369, 2379 (2014)).

A public employee's speech is pursuant to his employment duties "if it is 'part-and-parcel of' the employee's concerns about his ability to 'properly execute his duties.'" Lyons II, 875 F.3d at 1174 (quoting Williams v. Dall. Indep. Sch. Dist., 480 F.3d 689, 694 (5th Cir. 2007); accord Renken v. Gregory, 541 F.3d 769, 774 (7th Cir. 2008)). The First Amendment does not protect a public employee's speech if it "owes its existence to his professional responsibilities." Id. (quotation omitted).

Dr. Groenewold alleges that he was terminated in retaliation for speaking on a matter of public concern on the following issues: (1) his expressions regarding the amount of legal fees that the Center was required to pay to the University's attorneys; (2) his discussion about the University's reallocation of the Center's intellectual property licensing fee revenue; (3) his bid for additional land and his communications with the North Dakota legislative committee about the Center's need for additional space; (4) his statements to President Kelley about the Center entering into cooperative research agreements with other University departments; (5) his concerns about how the University's "over taxation" was contributing to the Center's budget deficit; and (6) his attempted discussions with Espegard regarding the newspaper article, the amount of legal fees that the Center was paying, and his desire to seek Espegard's advice on how to make his budget concerns known to the Board.

Dr. Groenewold asserts that his speech is protected because he never spoke about his own personal or financial interests, but instead only spoke out because of his concern for the Center. We disagree, because our post-Garcetti cases hold that speech made pursuant to a public employee's duties is not protected under the First Amendment, even if made under the guise of public concern. Lyons II, 875 F.3d at 1174-75 (listing cases); Buazard v. Meridith, 172 F.3d 546, 548 (8th Cir. 1999) (noting that when a public employee's speech is purely job-related, that speech will not be protected under the First Amendment); see also Ross v. Breslin, 693 F.3d 300, 307 (2d Cir. 2012) ("An employee's characterization of [his] own speech is not dispositive."). As director of the Center, part of Dr. Groenewold's professional responsibilities included overseeing the Center's function and finances. It was his responsibility to report to President Kelley budget variances, which were then ultimately reported to the Board. Thus, in these instances, Dr. Groenewold was not speaking as a private citizen, but rather in his capacity as director in an attempt to advance the Center's position with respect to balancing its budget, bringing in more revenue, or expanding its existence within the University. When contacting Espegard, for example, Dr. Groenewold thanked him for agreeing to meet with "us," which undoubtedly referred to the Center. When he expressed concerns over the Center's payment of attorney's fees, its decrease in licensing fees, or its over taxation, he was doing so in terms of the Center's budget, which fell within his responsibilities as director. Because his speech stemmed from his professional responsibilities and was made in furtherance of those responsibilities, it was not protected under the First Amendment.

Dr. Groenewold next argues that he was terminated without adequate pre- and post-termination procedural due process. A public employee granted a state law protected property interest in continued employment may not be terminated without due process. Sutton, 702 F.3d at 447. A public employee "receives sufficient due process if he receives notice, an opportunity to respond to the charges before his

termination, and post-termination administrative review." <u>Young v. City of St. Charles</u>, 244 F.3d 623, 627 (8th Cir. 2001).

To satisfy the minimal pre-termination procedural due process requirements, a public employee must be given "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." <u>Sutton</u>, 702 F.3d at 447 (quoting <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 545-46 (1985)). The purpose behind the pre-termination hearing is not to "'resolve the proprietary of the discharge,' but to serve as 'an initial check against mistaken decisions.'" <u>Id.</u> (quoting <u>Loudermill</u>, 470 U.S. at 545). These hearings therefore "need not be elaborate" if a post-termination proceeding is also available. <u>Loudermill</u>, 470 U.S. at 545.

Dr. Groenewold argues that his pre-termination due process rights were violated because he did not receive an adequate hearing, the notice given was too vague, and he was not given access to the pre-termination report completed by MacGregor. We disagree and conclude that President Kelley's letter of intent, setting forth as it did seven reasons for Dr. Groenewold's termination, accompanied by twenty-five specific examples of his alleged misconduct, constituted adequate pre-termination procedural due process. Dr. Groenewold had the opportunity to respond to these allegations in writing, which he did five days later. <u>See</u> <u>Jackson v. St. Joseph State Hosp.</u>, 840 F.2d 1387, 1397 (8th Cir. 1987) (stating that due process "only requires an opportunity to be heard prior to the termination of benefits" and "does not require predecision hearings"); <u>see also</u> <u>Krentz v. Robertson</u>, 228 F.3d 897, 903 (8th Cir. 2000) (holding that an employee received adequate due process when was notified by letter of the decision to terminate his employment, he was informed of the charge against him, and there was an opportunity for the employee to tell his side of the story). The University also conducted an independent review in response to Dr. Groenewold's request, and his failure to receive an initial copy of the post-review report did not in itself constitute inadequate pre-termination due process. <u>See</u> <u>Sutton</u>,

702 F.3d at 448 ("We have repeatedly observed that an employer need not disclose 'all of the details of the charges against the employee.'") (quoting Larson v. City of Fergus Falls, 229 F.3d 692, 697 (8th Cir. 2000); see also Krentz, 228 F.3d at 903 (stating that post-termination procedures may cure superficial pre-termination procedures).

Dr. Groenewold next contends that he withdrew from his post-termination administrative appeal once it became apparent to him that the remedies provided thereby were inadequate. A plaintiff may not bring a § 1983 post-deprivation procedural due process claim without first exhausting the state's available administrative remedies. Hopkins v. City of Bloomington, 774 F.3d 490, 492 (8th Cir. 2014). An employee therefore "waives a procedural due process claim by refusing to participate in post-termination administrative or grievance procedures" unless he proves that such remedies were inadequate. Krentz, 228 F.3d at 904; see Hudson v. Palmer, 468 U.S. 517, 539 (1984) (O'Connor, J., concurring) ("[I]n challenging a property deprivation, the claimant must either avail himself of the remedies guaranteed by state law or prove that the available remedies are inadequate.").

Dr. Groenewold claims that he did not exhaust his state law remedies because the final decision regarding his termination could have gone back to President Kelley in light of ALJ Fetch's denial of his requests for a more formal procedure and the lack of a written commitment that would have designated the University Chancellor as the final decision maker, resulting in a process that he argues would have been fundamentally unfair. He did not avail himself to that process, however, and therefore only speculates that the outcome would have been adverse to his position, which is insufficient to excuse his voluntary failure to exhaust his administrative remedies. Cf. Raymond v. Bd. of Regents of the Univ. of Minn., 847 F.3d 585, 592 (8th Cir. 2017) (noting that speculations of futility are not enough to excuse a claimant's failure to exhaust post-termination procedural due process remedies).

-11-

Accordingly, we conclude that Dr. Groenewold waived his post-termination procedural due process rights.

Dr. Groenewold has also failed to establish a substantive due process claim because he has not shown that President Kelley's decision to terminate him was both "conscience shocking" and in violation of "one or more fundamental rights that are 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" Moran v. Clarke, 296 F.3d 638, 651 (8th Cir. 2002) (en banc) (Bye, J., concurring and writing for majority on this issue) (quoting Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997)).  Dr. Groenewold claims that President Kelley's decision to terminate him was wholly unsupported by a basis in fact. We disagree.  Dr. Groenewold admitted that he had overruled Associate Director Erickson's proposed budget variance report, which was drafted in accordance with the Board's policy.  He also admitted that he had contacted Espegard to discuss the Center's budget and seek his advice on how to advance his position with the Board.

Because Dr. Groenewold failed to allege that President Kelley violated his constitutional rights, the district court properly dismissed the individual capacity claims against President Kelley, concluding that he is entitled to qualified immunity. The district court also properly dismissed the claims against defendants in their official capacity, because without a constitutional violation there is no basis for a § 1983 claim.  See Dover Elevator Co. v. Ark. State Univ., 64 F.3d 442, 445 (8th Cir. 1995).

The judgment is affirmed.

_____