# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-1941

_____

William Anderson, as trustee for the next-of-kin of Jacob William Anderson (deceased)

*Plaintiff - Appellant*

v.

City of Minneapolis; County of Hennepin; Hennepin Healthcare System, Inc.; Dr. Brian Mahoney, M.D., as then-Medical Director of the HCMC Ambulance Service; Shana D. York; Anthony J. Buda; Raul A. Ramos, and John Doe individuals to be determined, Individual Fire Department Personnel in Their Individual Capacities; Daniel F. Shively, and John Doe individuals to be determined, Individual HCMC Ambulance Services Personnel in Their Individual Capacities; Mitchel Morey, M.D., Individual Medical Examiner's Office Personnel, in his Individual Capacity; Daniel J. Tyra; Shannon L. Miller; Dustin L. Anderson; Scott T. Sutherland; D. Blaurat; Emily Dunphy; Christopher Karakostas; Matthew George; Joseph McGinness; Calvin Pham; Arlene M. Johnson; Matthew T. Ryan, and John Doe individuals to be determined, Individual Police Officers in Their Individual Capacities

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 12, 2019
Filed: August 20, 2019

_____

Before SHEPHERD, ARNOLD, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

As the district court noted, this is a tragic case. Jacob Anderson (Jacob) died of hypothermia in Minneapolis, Minnesota on December 15, 2013. His father, William Anderson (Anderson), brought this suit alleging federal constitutional and state tort claims against the City of Minneapolis, Hennepin County, and several city and county employees.[1] The district court[2] granted defendants' motions to dismiss with prejudice. Anderson appeals the dismissal of his constitutional claims, and we affirm.

I.

A.

In the fall of 2013, Jacob was a 19-year old freshman at the University of Minnesota, Twin Cities. He was an active member of the university community. On the night of December 14, 2013, he attended a party with several other students. He left around 11:15 p.m.

Jacob was discovered the next morning, lying face down in the snow in a remote area of Minneapolis near the Mississippi River. The passerby who found him

_____

[1] Because there are many individual defendants in this case, for clarity and concision we refer to them, where appropriate, in groups by their professional affiliations: firefighters, paramedics, and police.

[2] The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

called 911 at 8:44 a.m. The first responders, employees of the Minneapolis Fire Department, arrived on the scene ten minutes later. The fire department defendants, some of whom were certified emergency medical technicians, performed a 30-second check on Jacob's pulse by holding his wrist, which was frostbitten and cold to the touch. Failing to find a heartbeat, the fire department defendants pronounced him dead at 8:57 a.m.

Having declared Jacob dead, the fire department defendants cancelled the ambulance and called police to the scene. However, the paramedics had already arrived. The paramedic defendants spoke with the fire department defendants but did not separately evaluate Jacob's condition and left after about two minutes. Several police officers arrived next. Shortly after the first police defendants arrived, the fire department defendants left. The police treated the area as a potential crime scene and notified the Hennepin County Medical Examiner's Office at 10:30 a.m.

The medical examiner's office sent two investigators to the scene. After conducting an examination of Jacob's body, which was still where it had been found almost two hours earlier, the investigators called defendant Assistant Medical Examiner Mitchel Morey, M.D. Based on the investigators' report, Morey did not visit the scene. Eventually, the medical examiner's office conducted an autopsy and determined that Jacob died of hypothermia. The autopsy listed the time of death as 8:48 a.m. Anderson alleges that Jacob may have in fact died several hours later, after emergency responders had declared him dead.

B.

Hypothermia is a medical condition that occurs when a body falls below 95 degrees Fahrenheit and cannot produce enough heat to replace what it loses.[3] App.

---

[3] The facts in this section, regarding the pathophysiology of hypothermia and frostbite, are drawn, as they must be at the motion to dismiss stage, from Anderson's complaint. *See Owen v. Gen. Motors Corp.*, 533 F.3d 913, 918 (8th Cir. 2008).

86. Frostbite is a medical condition that occurs when the skin and underlying tissues freeze. App. 87. Hypothermia and frostbite act together in ways that often disguise signs of life and make it particularly difficult for first responders to determine whether an individual is actually dead or just in a severely hypothermic condition. *Id.*

Despite appearances, individuals can make remarkable recoveries from even severe hypothermia. App. 88. As a result, first responders are trained to provide treatment even to apparently deceased hypothermia victims. For example, Minneapolis Fire Department standard operating procedures prescribe that first responders "[b]egin CPR immediately when [a] patient is found cold in a cold environment." App. 93. The Hennepin EMS protocol specifically notes that "clinical signs of death may be misleading" and instructs medical personnel to transport any bodies with a temperature below 86 degrees Fahrenheit in a cold environment to facilities prepared "for active internal rewarming." App. 104. Anderson alleges that Jacob passed away because these guidelines were not followed in this case.

C.

On December 8, 2016, Anderson and his wife, Kristi Anderson, filed a complaint in the district court against individual responders and the entities that responded to the 911 call. The complaint listed Anderson as the personal representative of Jacob's estate.

On March 9, 2017, more than three years after Jacob's death, Anderson was appointed as trustee for Jacob. On April 19, 2017, Anderson filed the operative Second Amended Complaint, alleging four causes of action under federal law and two causes of action under state law. The district court dismissed both state law causes of action, finding that, under Minnesota law, the claims were required to be brought by an appointed trustee within three years of Jacob's death. Anderson does not appeal that decision.

-4-

The district court also dismissed the federal claims, all of which were brought under 42 U.S.C. § 1983 alleging violations of Jacob's substantive due process rights by first responders and their employing municipalities. Although it held that a different statute of limitations governed those claims and they were therefore properly before the court, the district court concluded that qualified immunity barred the claims against the individual defendants. Anderson could not show that the individual defendants had violated Jacob's substantive due process rights because he could not show that the state actors had created or exacerbated the danger to Jacob, placed Jacob "in custody," or alleged conduct sufficiently "conscience-shocking" to give rise to a claim under the Fourteenth Amendment. Because the district court found no individual liability, it dismissed the claims against the city and county defendants too.

Anderson timely appeals the federal claims advancing the single argument that the district court erred in finding qualified immunity, because the individual defendants created or exacerbated the danger to Jacob.

II.

Before reaching the merits of the dispute, "[w]e begin with jurisdiction, which is always our first and fundamental question." *Franklin v. Peterson*, 878 F.3d 631, 635 (8th Cir. 2017) (citation omitted). We review the district court's determination that it had subject matter jurisdiction *de novo*. *Am. Family Mut. Ins. Co. v. Vein Ctrs. for Excellence, Inc.*, 912 F.3d 1076, 1080 (8th Cir. 2019). The defendants claim that we lack jurisdiction because this action was not brought by an appointed trustee within three years of Jacob's death as Minnesota state survival law requires. *See* Minn. Stat. § 573.02, subd. 1. The district court thoroughly addressed this argument and correctly concluded that it (and we) have jurisdiction.

As the district court explained, we look to Minnesota's survivorship statute only to determine *who* can bring a § 1983 action on behalf of a deceased individual.

-5-

*Estate of Guled v. City of Minneapolis*, 869 F.3d 680, 683 (8th Cir. 2017). We do not incorporate other rules—like the limitations period—that are found in that statute. Rather, as we have held several times, the limitations period for all § 1983 actions in Minnesota comes from the state's personal injury statute and is set at six years. *See, e.g.*, *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618 n.3 (8th Cir. 1995); Minn. Stat. § 541.05, subd. 1(5). We have jurisdiction because Anderson brought this suit within six years of Jacob's death.

## III.

We review the district court's grant of a motion to dismiss based on qualified immunity *de novo*, taking the facts as alleged by the plaintiff. *Groenewald v. Kelley*, 888 F.3d 365, 370 (8th Cir. 2018).

## A.

Anderson's claims against the various individual defendants in this case depend upon slightly different factual allegations, but they are essentially one claim: the defendants, by prematurely declaring Jacob dead and therefore cutting off possible aid, caused his death in violation of the due process clause of the Fourteenth Amendment. Because Jacob has failed to identify a clearly established right, we hold the individual defendants are entitled to qualified immunity.

As a general rule, state actors are not liable for failing to save individuals in life-threatening situations. The due process clause is not "a guarantee of certain minimal levels of safety and security" and it does not "impose an affirmative obligation on the State to ensure that [its citizens'] interests do not come to harm through other means." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). However, "the state owes a duty to protect individuals if it created the danger to which the individuals are subjected." *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005) (citation omitted). State officials "create[] the danger"

-6-

faced by an individual when they "act affirmatively to place [him] in a position of danger that he . . . would not otherwise have faced." *S. S. v. McMullen*, 225 F.3d 960, 962 (8th Cir. 2000) (en banc). Anderson argues that happened here.

We need not reach the merits of this argument if the individual defendants are entitled to qualified immunity. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (citation omitted). To overcome a qualified immunity defense, a plaintiff must show both that a statutory or constitutional right has been violated and that the right was clearly established at the time of the alleged violation. *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014). We "have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). Because Anderson has failed to show the violation of a clearly established right, we resolve this case on that ground.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "A plaintiff need not always identify a case directly on point, but controlling authority or a robust consensus of cases of persuasive authority must put the statutory or constitutional question beyond debate." *Swearingen v. Judd*, 930 F.3d 983, __, 2019 WL 3227454, at *2 (8th Cir. July 18, 2019) (citation omitted). As the Supreme Court has repeatedly stressed, we are "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742.

Here we must ask whether, in December 2013, it was clearly established that the Fourteenth Amendment is violated when:

- fire department employees check the vitals on a hypothermia victim and declare him dead despite the fact that he is cold in a cold environment;[4]
- paramedics and the medical examiner do not conduct their own assessment of a hypothermia victim after earlier responders declare the victim dead;
- police officers do not conduct their own medical assessment of a hypothermia victim and treat the scene as a crime scene after earlier responders declare the victim dead.

We have never identified the right that Anderson asserts was violated. Anderson claims that *Freeman v. Ferguson*, 911 F.2d 52 (8th Cir. 1990) and *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990) show that the right he identifies is clearly established, but neither case defines a specific right that is applicable here.

Shortly after *DeShaney* recognized "state created danger" liability, we held that a state actor may be liable when he "has taken affirmative action which increases the individual's . . . vulnerability . . . beyond the level it would have been absent state action." *Freeman*, 911 F.2d at 55. Freeman, as representative of Geraldine and Valerie Downen's estates, brought suit against the police chief of Dumas, Arkansas for failing to protect the decedents from their husband and father who murdered them. *Id.* at 53. Freeman alleged the chief of police had interfered with his subordinates' earlier attempts to protect the victims from the murderer. *Id.* at 54. We explained that "[i]t is not clear, under *DeShaney*, how large a role the state must play in the creation of danger and in the creation of vulnerability before it assumes a corresponding constitutional duty to protect. It is clear, though, that at some point such actions do create such a duty." *Id.* at 55. We noted that we could find liability under *DeShaney*

---

[4] Because these claims are similar, and because the claim against the fire department defendants presents the closest call, we will analyze the qualified immunity issue primarily through that lens. The analysis is the same for each group of individual defendants.

where "the state has taken affirmative action which increases the individual's . . . vulnerability . . . beyond the level it would have been at absent state action." *Id.* We thus remanded the case and permitted Freeman to replead in light of *DeShaney*. *Id.*

Anderson argues that *Freeman* recognized his claim that the fire department defendants' premature declaration of death made Jacob more vulnerable to hypothermia because it foreclosed any further assistance from the paramedics or police while he was alive. But *Freeman* only left open the possibility that we could recognize such a claim—it did not clearly establish a rule that such a claim is valid.[5] We explained that "the law is not entirely established as to the extent to which the government must increase the danger of private violence before it assumes a corresponding duty to protect." *Id.* at 55. In the decades since then, no case has settled the state's duty in these circumstances.

*Ross* offers more specific guidance regarding the application of the *DeShaney* state-created danger exception, but it also differs significantly from this case. In *Ross*, a defendant police officer threatened to arrest two lifeguards, two firefighters, one police officer, and two civilian scuba divers if they attempted to rescue a boy who had recently fallen into Lake Michigan. 910 F.2d at 1424–25. Approved rescuers arrived twenty minutes later, by which time the boy had drowned. *Id.* The Seventh Circuit found a constitutional violation because the county, rather than merely failing to provide rescue services, "had a policy of arbitrarily cutting off private sources of rescue without providing a meaningful alternative." *Id.* at 1431. Importantly for Anderson, the court stripped the officer of qualified immunity because it was clearly established that a victim had a constitutional right to not have the state exert its power to prevent his rescue when not undertaking its own rescue operation. *Id.* at 1432.

---

[5] At most, *Freeman* outlines the state's duty to protect at the level of "a broad general proposition," but does not establish any rule relevant to "the specific context of [this] case." *Mullenix*, 136 S. Ct. at 308. As such, it does not clearly establish a right that defeats the individual defendants' qualified immunity defenses.

The court founded this right in the "fundamental tenet of our constitutional jurisprudence" that "the state cannot arbitrarily assert its power so as to cut short a person's life." *Id.* at 1433.

Unlike in *Ross*, no one intentionally or arbitrarily cut off emergency services to Jacob. Once the fire department defendants declared him dead the emergency response did not end but it changed. The defendants in this case may have performed their duties poorly, but if so, they made an error in judgment of the sort that qualified immunity protects. *See Walker*, 414 F.3d at 992. They did not intentionally deny emergency aid to someone they believed to be alive. The situation presented by this case is unique and the constitutional rule recognized in *Ross* does not apply to these facts.

In more factually similar cases, courts have found a constitutional violation only where the government has taken a more active role in placing the victim in harm's way. *See, e.g.*, *Riordan v. City of Joliet*, 3 F. Supp. 2d 889, 898–99 (N.D. Ill. 1998) (denying qualified immunity to police officers who dropped off an extremely intoxicated man on the side of the road at night in freezing weather). But even then, our cases demonstrate that a plaintiff faces a high bar. *See Gladden v. Richbourg*, 759 F.3d 960, 966–67 (8th Cir. 2014) (granting qualified immunity to officers who left plaintiff out in the cold because the plaintiff was not so extremely intoxicated that it was obvious to officers that he could not walk or make decisions for himself). The defendants in this case did not place Jacob out in the cold. Despite the tragic consequences that Anderson argues followed from their alleged failures, the defendants did not violate a clearly established due process right.

Lacking an analogous case, Anderson argues that under *Hope v. Pelzer*, 536 U.S. 730 (2002), regulations can place state actors on notice that their actions violate an individual's constitutional rights. But *Hope* does not stand for that proposition. In *Hope,* prison guards handcuffed an inmate to a hitching post and left him there for

seven hours as a punishment. *Id.* at 734–35. The Supreme Court denied qualified immunity *in part* because the guards had failed to follow a regulation that required officers to log an inmate's responses to offers of water and bathroom breaks every fifteen minutes when the inmate was shackled to fence posts. *Id.* at 744. The regulation had frequently been ignored in the past, which the Court considered evidence that the guards "were fully aware of the wrongful character of their conduct." *Id.* at 744. But the regulation was ultimately less important to *Hope*'s conclusion that the prison guards had violated the Constitution than: (1) a binding circuit case that recognized "handcuffing inmates to the fence and to cells for long periods of time" was unconstitutional, and (2) a notice from the Department of Justice warning the state prison system that its use of the hitching post fell below the requirements of both the Constitution and its own regulations. *Id.* at 742–45 (quoting *Gates v. Collier*, 501 F.2d 1291, 1306 (5th Cir. 1974)). These were the facts—not the existence of the prison regulation—that the Court held should have "put a reasonable officer on notice that the use of the hitching post under the circumstances alleged by Hope was unlawful." *Id.* at 745–46.

Anderson's argument that the regulations directing first responders to begin CPR and rewarming even where a hypothermia victim appears dead should be treated as evidence of a clearly established constitutional duty therefore fails because *Hope* itself was based on much more than the existence of a regulation. But even if Anderson were correct about what *Hope* means, we do not think that *Hope*'s rationale necessarily applies outside of the prison context. While it seems likely that the contours of a regulation regarding punishing prisoners will be informed at least in part by the Eighth Amendment, there is no reason to think that medical guidelines for first responders enshrine duties arising out of the Fourteenth Amendment. That the medical guidelines were not followed here could possibly be the basis for a negligence suit, but it is not the basis for a constitutional one.

We also reject Anderson's argument that qualified immunity is inapplicable because the first responders were not executing discretionary functions. We have previously suggested that the exception to qualified immunity for non-discretionary or ministerial acts is a "dead letter." *Sellers v. Baer*, 28 F.3d 895, 902 (8th Cir. 1994), *cert. denied*, 513 U.S. 1084 (1995); *see also*, *DeArmon v. Burgess*, 388 F.3d 609, 613 (8th Cir. 2004). Regardless of the state of the exception, it does not apply here. We explained in a similar case:

> The exception to qualified immunity for functions that are "ministerial" rather than "discretionary" is quite narrow. For qualified immunity purposes, a duty is "ministerial" only where the statute or regulation leaves no room for discretion—that is, it specif[ies] the precise action that the official must take in each instance. In addition, the ministerial-duty exception applies only where it is the violation of the ministerial duty that gives rise to the cause of action for damages.

*Sellers*, 28 F.3d at 902 (citations omitted). As in *Sellers*, Anderson cannot claim that he is entitled to damages simply because the regulations at issue were violated. "[T]he issue before us is whether the [defendants'] conduct violated any clearly established constitutional rights, not whether the [defendants] may have violated departmental regulations." *Id.* Anderson makes his claims based on the Fourteenth Amendment, not the Minneapolis Fire Department's regulations, and therefore the defendants are eligible for qualified immunity.

Finally, Anderson makes several other arguments directed at the district court's conclusion that no constitutional violation occurred. Because we do not reach that question, we need not address them.

B.

The district court dismissed Anderson's claims against the municipalities because it found no underlying constitutional violation. Although we do not decide

that issue, Anderson's claims against the municipalities still fail because they require a showing of deliberate indifference on the part of the municipalities. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Municipalities "cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc). As we have explained, although this case is undeniably tragic, Anderson has not alleged the violation of a clearly established right and he therefore cannot show deliberate indifference on the part of any municipality.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____