# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-1287
_____

Joshua Lee Close, Individually and as Administrator of the Estate of Angela Marie
Prichard; Colton Hancock, Individually

*Plaintiffs - Appellants*

v.

City of Bellevue Iowa; Dennis Schroeder; Ryan Kloft; Shelby Mutzl

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Northern District of Iowa - Eastern
_____

Submitted: November 19, 2025
Filed: June 24, 2026
_____

Before BENTON, GRASZ, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

Courts cannot remedy every wrong. Following Angela Prichard's death at the
hands of her ex-husband, her family wants to hold the City of Bellevue responsible.
Neither the United States Constitution nor Iowa law gives them a claim, however,
so we affirm the dismissal of their complaint.

I.

Angela's ex-husband, Christopher, harassed and stalked her for months. A no-contact order provided some protection, but when it expired, he sent text messages threatening to "destroy her business" and warning that "it [was] going to get real fucking ugly." She also discovered a tracking device in her car and hidden cameras around her home. Nothing she did seemed to help, including reporting the harassment to the police.

Not even a temporary restraining order made a difference. It specifically prohibited Christopher from coming within her "immediate vicinity" and ordered him not to "threaten, assault, stalk, molest, sexually abuse, attack, harass, or otherwise abuse" her. Any violations were supposed to result in his immediate "arrest[]."

Still, the harassment did not stop. One night, Christopher vandalized Angela's home. On another, he drove past it six times in a single hour. Rather than take action, one officer told her to contact a lawyer. Others broke their promise to follow up with her after consulting the county attorney. Eventually, Angela took matters into her own hands and left home. Troublesome texts and a note left on her front steps finally led to Christopher's arrest.

Even then, he spent a total of one night in jail. In the weeks that followed, he ignored court orders to appear and self-surrender, resulting in the issuance of a "Mittimus/Warrant of Commitment" that required "any peace officer in the state" to "deliver [him] . . . into the custody of the . . . Sheriff." (Capitalization omitted). And under the restraining order, which became permanent, probable cause of a violation still required "arrest."

In the meantime, Angela decided to move back home. The Chief of Police recommended that she wait, concerned that Christopher might "hurt her and/or himself," but he did not take any steps to protect her. When a gunshot wound to the

-2-

chest ended Angela's life just a week later, all eyes turned toward Christopher. He claimed the shooting was an accident, but a jury found him guilty of murder.

In the wake of the tragedy, Angela's sons, on behalf of themselves and her estate, sued the City of Bellevue and three police officers. The complaint alleged a mix of federal and state claims, but the theory underlying them all was that law enforcement had failed to keep her safe.

According to the district court,[1] no duty to do so existed under federal or Iowa law. After it granted the defendants' motion to dismiss, the family filed a Rule 59(e) motion with an eye toward amending their complaint, but the court denied it as both untimely and futile. Even if an amendment had come earlier, the complaint still would have been missing "sufficient factual matter, accepted as true, to state a claim to relief that [was] plausible on its face." *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1364 (8th Cir. 2022) (citation omitted); *see Rowles v. Curators of the Univ. of Mo.*, 983 F.3d 345, 358 (8th Cir. 2020) (explaining that our review is de novo).

## II.

The problem starts with the family's federal claim, which alleges that the failure to protect Angela *from Christopher* violated substantive and procedural due process. Neither theory works.

## A.

Substantive due process is a poor fit because the Supreme Court has described it as "a *limitation* on the State's power to act, not . . . a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,

---

[1]The Honorable C.J. Williams, Chief Judge, United States District Court for the Northern District of Iowa.

489 U.S. 189, 195 (1989) (emphasis added). In *DeShaney*, the Court declined to hold a state agency liable on a substantive-due-process failure-to-protect theory for the harm suffered by a child living in an abusive household. *See id.* at 191. Even if the social workers assigned to the case could have played a "more active role," a "failure to protect an individual [from] private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 203.

This case is just a police-officer permutation of *DeShaney*'s no-duty rule. Here, the family blames the City of Bellevue and its officers for not doing more to protect Angela. In their view, the officers should have at least arrested Christopher for repeatedly violating the restraining order. It is a mirror image of the claim from *DeShaney*: the government had a duty to "protect [Angela's] life . . . against invasion" from Christopher. *Id.* at 195.

If anything, the argument for liability in *DeShaney* was stronger. There, the social workers performed at least one act: "return[ing]" the child to the abusive household. *Id.* at 201. Even then, however, they had no "affirmative obligation" to protect him. *Id.* at 195. With nothing comparable here and action the dividing line for constitutional liability, the officers in this case came nowhere close to it.

For that reason, the exception for state-created dangers also cannot save the family's claim.[2] *See Montgomery v. City of Ames*, 749 F.3d 689, 694–95 (8th Cir. 2014) (listing its requirements). To create a danger, after all, there must be some "*affirmative*[]" action by the government. *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005) (emphasis added) (citation omitted). And here, the allegations

---

[2]It bears noting that the Supreme Court has never recognized this exception. In fact, there seems to be little left of it after *DeShaney* limited liability to situations in which the government imposes a "limitation . . . on [a person's] freedom to act." 489 U.S. at 200. It is no surprise that we have yet to find a case in which it applies. *See Anderson ex rel. Anderson v. City of Minneapolis*, 934 F.3d 876, 882 (8th Cir. 2019) (remarking that "no case has settled the state's duty" under the state-created-danger doctrine); *Freeman v. Ferguson*, 911 F.2d 52, 53–55 (8th Cir. 1990) (recognizing that such a claim *could* exist).

in the complaint describe a failure to "act[]," not anything *"affirmative"* that "increase[d] [the] danger of[] . . . violence." *K.B. v. Waddle*, 764 F.3d 821, 824 (8th Cir. 2014) (emphasis added) (citation omitted). Even "absent state action," Angela's life was in jeopardy. *Id.*; *see Montgomery*, 749 F.3d at 692, 695 (rejecting a claim when, in response to a potential violation of a protective order, an officer provided a warning but did not arrest the abuser, which later led to an assault).

B.

The failure-to-protect theory works no better through a procedural-due-process lens. To nudge the claim "past the plausibility threshold," *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022), the family needs a "legitimate claim of entitlement" based on "existing rules or understandings that stem from an independent source such as state law," *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citations omitted). Their "independent source" is an Iowa statute governing the enforcement of no-contact orders. *Id.* (citation omitted). It says that a police officer with "probable cause to believe that a person has violated a no-contact order . . . *shall* take the person into custody." Iowa Code § 664A.6(1) (emphasis added). From a mandatory duty came a "legitimate claim of entitlement," *Castle Rock*, 545 U.S. at 756 (citation omitted), or so the argument goes.

Discretion, however, sometimes hides behind mandatory language. *See id.* at 761. Here, it comes from the notion of "probable cause," which "is incapable of precise definition," "turn[s] on the assessment of probabilities in particular factual contexts[,] and cannot be reduced to a neat set of legal rules." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (first alteration in original) (citations omitted); *see Watson v. Boyd*, 119 F.4th 539, 551 (8th Cir. 2024) (explaining that, although "[p]robable cause is an objective standard," courts "afford officers *substantial latitude* in interpreting and drawing inferences from factual circumstances" (emphasis added) (citation omitted)). And even if it were more definite, officers would still have "some discretion to determine that . . . the circumstances of the

violation or [their] competing duties . . . counsel decisively against enforcement." *Castle Rock*, 545 U.S. at 761. Despite its mandatory terms, the Iowa statute gave officers room to decide whether to arrest Christopher.

*Castle Rock* presented a nearly identical scenario. The Colorado statute there included several instructions, one of which said that a police officer "shall arrest[] or . . . seek a warrant for [an] arrest . . . when [he or she] has information amounting to probable cause" of a "violat[ion]" of "any provision of a restraining order." *Id.* at 759 (emphases omitted) (quoting Colo. Rev. Stat. § 18-6-803.5(3)(b)(I) (1999)). Against the "deep-rooted nature of law-enforcement discretion," even a statute using the phrase "shall arrest" needed "some stronger indication" to make it "a true mandate of police action." *Id.* at 761. With some leeway, in other words, came no entitlement. *See id.* at 766.

It is true that the Colorado statute gave officers the option of "seek[ing] a warrant" when immediate arrest "would be impractical under the circumstances," Colo. Rev. Stat. § 18-6-803.5(3)(b) (1999), an extra element of discretion that the Iowa statute does not have. But *Castle Rock* addressed that possibility too. Even compulsory duties, the Court said, do not necessarily create a constitutional right "to *enforcement*," when the claimed "entitlement" arises "out of a function that government actors have always performed." *Castle Rock*, 545 U.S. at 764–67.

Here, it did. "[A]rresting people [based on] probable cause" has always been a government function. *Id.* at 767; *see O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 787 (1980) ("[A]n indirect and incidental result of the Government's enforcement action[] does not amount to a deprivation of any interest in life, liberty, or property."). And the Iowa legislature made a claim of entitlement even more of a reach here by cutting off all "civil[] or criminal[] liab[ility]" absent a "willful or wanton disregard for the rights or safety of another." Iowa Code § 664A.6(3). A rarely enforceable obligation with no "ascertainable monetary value" is not an entitlement at all, much less one that gives rise to a protected property interest. *Castle Rock*, 545 U.S. at 766 (citation omitted) (making clear that even the right to

"enforce[] . . . a restraining order" may not be enough); *see Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The absence of a legitimate claim of entitlement or a duty to arrest means that the family lacks a plausible due-process claim in both "its procedural [and] . . . substantive manifestations." *Castle Rock*, 545 U.S. at 768 (internal quotation marks omitted).

## III.

The family has no better luck in bringing a direct claim under Iowa law. They point us to a familiar spot: the no-contact-order statute.[3] Unraveling whether a private right of action exists requires us to examine its "text and structure." *Shumate v. Drake Univ.*, 846 N.W.2d 503, 509 (Iowa 2014). Only if ambiguity remains will we dig any deeper. *See id.*

Here, the "text and structure" tell us all we need to know.[4] *Id.* To start, the no-contact-order statute, unlike some others, does not mention a right to sue. *See, e.g.*, Iowa Code § 708.7(7) (allowing "[a] person injured by a violation" of an Iowa harassment law to "bring a civil action against the person" who violated it); *id.* § 714H.5(1) (giving a "consumer who suffers an ascertainable loss" due to fraud or other prohibited practices the right to "bring an action at law to recover actual damages"). Indeed, the first two subsections focus exclusively on what "peace officer[s]" must do when facing a violation, *id.* § 664A.6(1)–(2), without any

---

[3]The family also draws on the protective-order statute, *see* Iowa Code § 236.11(1), but it is identical in all relevant respects, *compare id.*, *with id.* § 664A.6(1). Regardless of how we characterize the order in this case, the analysis and conclusion are the same.

[4]For that reason, we decline the family's belated request for certification. *See City of Houston v. Hill*, 482 U.S. 451, 471 (1987) (concluding that certification was "inappropriate" when a state statute was "[un]ambiguous"); *see also Jung v. Gen. Cas. Co. of Wis.*, 651 F.3d 796, 801 (8th Cir. 2011) (affirming the denial of a motion to certify and noting that federal courts can "address matters of state law, even when that law is unsettled").

mention of the "class" of people the statute benefits, *Est. of McFarlin v. State*, 881 N.W.2d 51, 57 (Iowa 2016) (citation omitted). A private right of action does not "automatically" spring from "a statutory duty," *Teague v. Mosley*, 552 N.W.2d 646, 650 (Iowa 1996), much less one that never mentions the person attempting to sue, *see* Iowa Code § 664A.6(1).

Nor does the next subsection imply one. *See id.* § 664A.6(3); *State v. Boone*, 989 N.W.2d 645, 649–50 (Iowa 2023) ("We read statutes as a whole, meaning we look beyond the isolated words and phrases to obtain a construction that is in harmony with surrounding provisions."). It says that police officers "shall not be held civilly or criminally liable for acting pursuant to this section" if they "act[] in good faith" and without "a willful or wanton disregard for the rights or safety of another." Iowa Code § 664A.6(3). At first glance, the provision looks promising because it suggests by negative implication that a private right of action might exist. *See Shumate*, 846 N.W.2d at 507 (noting that a statute may "implicitly create[] the right to sue"). But it is less helpful than it seems for two reasons. The first is that it discusses only when there *cannot* be a lawsuit, not when there can be. And the second is that, to the extent the provision *might* give rise to a private right of action, it would only be for "acts," not omissions. Iowa Code § 664A.6(3); *see Boone*, 989 N.W.2d at 649–50.

The lack of a private right of action should come as no surprise because Iowa courts have "repeatedly declined to find an implied private right to sue under general regulatory statutes" like this one. *Est. of McFarlin*, 881 N.W.2d at 58. The statute appears in a chapter called "No-Contact Orders—Enforcement of Protective Orders," Iowa Code Title XV, Subtitle 5, ch. 664A, which provides for "no-contact order[s]" if a magistrate "finds . . . [p]robable cause" that a person has committed an offense like stalking or harassment and poses a "threat to the safety of the alleged victim." *Id.* § 664A.3(1)(a)–(b); *see Seeman v. Liberty Mut. Ins. Co.*, 322 N.W.2d 35, 36, 42 (Iowa 1982) (concluding that a statute prohibiting "unfair methods of competition" did not imply a private right of action because the surrounding provisions focused on the insurance commissioner's "administrative powers"

-8-

(citation omitted)). But the remedy for noncompliance is against the individual who violates it, *see* Iowa Code § 664A.7 (allowing contempt sanctions), not the officers who enforce it, *see Shumate*, 846 N.W.2d at 512–13 (noting that it is "telling" when the legislature includes a remedy in one statute but not in another nearby). That is, it gives no "indicat[ion]" of a private right of action. *M.H. ex rel. Callahan v. State*, 385 N.W.2d 533, 537 (Iowa 1986) (requiring one when the legislature has elsewhere "explicitly addressed situations when civil liability attaches").

If the no-contact-order statute does not create one directly, the family believes it must do so indirectly through Iowa's Municipal Tort Claims Act. It provides, in relevant part, that "a municipality shall be liable *only* to the extent liability may be imposed by the express statute dealing with such claims." Iowa Code § 670.4(1) (emphasis added). As a non-rights-creating statute, *see id.* § 670.4(3) (declaring that it "does not expand any existing cause of action or create any new cause of action against a municipality"), its function is to pierce immunity when *another* statute "expressly recognizes the existence of . . . liability," *Mormann v. City of Manchester*, 27 N.W.3d 820, 832 (Iowa 2025) (emphasis omitted). Here, it just sends us right back to the no-contact-order statute, which at *most* "recognizes the existence of . . . liability" for government acts, not omissions, *id.* (emphasis omitted). In other words, a different situation.

## IV.

The same goes for the family's other state-law claims. The first one relies on the Iowa Slayer Statute, which prevents a "person who *intentionally* and unjustifiably causes or procures the death of another" from "receiv[ing] any property, benefit, or other interest by reason of the death." Iowa Code § 633.535(1) (emphasis added). A straightforward example is when a beneficiary of a will, trust, or insurance policy intentionally kills someone to collect the proceeds. *See Kascoutas v. Fed. Life Ins. Co.*, 179 N.W. 133, 134–35 (Iowa 1920). It is a poor fit here for two reasons. First, there is no allegation that any of the officers will profit from Angela's death, much less that they *intentionally* caused it. And second, the

statute shields money and other "property" from a slayer. Iowa Code § 633.535(1). It does not allow someone else to recover for the wrongful death, which is how the family wants to use it here.

Their intentional-infliction-of-emotional-distress claim ends in the same place. To get past a motion to dismiss, the complaint must have alleged conduct "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 801 (Iowa 1984) (citation omitted). It would include, for example, arresting someone for fun or based on fabricated evidence. *See* Restatement (Second) of Torts § 46, cmt. e (Am. L. Inst. 1965) (explaining that "extreme abuse of [a police officer's] position," including "an attempt to extort money by a threat of arrest," may suffice as "extreme and outrageous"); *Est. of Fields by Fields v. Shaw*, 954 N.W.2d 451, 458 (Iowa Ct. App. 2020) ("Iowa courts frequently consult the Restatements as guidance on tort questions."). What is not "extreme" or "atrocious," at least according to Iowa courts, is an inadequate investigation into child-abuse allegations. *Lennette v. State*, 975 N.W.2d 380, 392 (Iowa 2022). If the lack of an investigation into those circumstances is not, then it is hard to see why refusing to arrest a spouse for violations of a no-contact order would be. Even if, as the family reminds us, the consequences of the poor police work here were tragic.

V.

The final loose end is whether the district court abused its discretion when it denied the family's request to amend the judgment. *See* Fed. R. Civ. P. 59(e); *Drobnak v. Andersen Corp.*, 561 F.3d 778, 788 (8th Cir. 2009) (explaining that the district court's discretion is "considerable" because "such motions are disfavored" (citation omitted)). A without-prejudice dismissal would have allowed them to file an amended complaint, one that they believe could have survived a motion to dismiss.

Although a court may grant post-judgment leave to amend, the "stringent standards governing the grant of Rule 59(e) . . . relief" apply. *In re SuperValu, Inc.*, 925 F.3d 955, 961 (8th Cir. 2019) (citation omitted). No longer does "new evidence, . . . new legal theories, or . . . arguments [that] could have been offered or raised prior to entry of judgment" provide justification for it. *Tukaye v. Troup*, 157 F.4th 958, 962 (8th Cir. 2025) (citation omitted). Freely given amendments, in other words, end once the district court enters judgment. *See* Fed. R. Civ. P. 15(a)(2); *Hawks v. J.P. Morgan Chase Bank*, 591 F.3d 1043, 1050 (8th Cir. 2010) ("After a complaint is dismissed, the right to amend under Fed. R. Civ. P. 15(a) terminates." (citation omitted)).

Viewed through that lens, there was no abuse of discretion in denying the family's motion. Most of the information they wanted to add was available "prior to entry of judgment." *Tukaye*, 157 F.4th at 962 (citation omitted). And the rest "added little, if any, . . . substance to the original complaint." *Dorn v. State Bank of Stella*, 767 F.2d 442, 444 (8th Cir. 1985) (per curiam). Among the additions were the facts surrounding Christopher's arrest, like how the officers allowed him to ride up front and call his lawyer in the squad car, even though they do not "normally do that." In the end, however, none of the new allegations would have "nudged" the claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## VI.

We accordingly affirm the judgment of the district court.

_____